1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5
    ROBBINS GELLER RUDMAN
6     & DOWD LLP
    SAMUEL H. RUDMAN
7   EVAN J. KAUFMAN
    58 South Service Road, Suite 200
8   Melville, NY  11747
    Telephone:  631/367-7100
9   631/367-1173 (fax)

10  Attorneys for Plaintiff

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13  JIM McMILLAN, Individually and on Behalf   )   Case No.
    of All Others Similarly Situated,          )
14                                             )   CLASS ACTION
                         Plaintiff,            )
15                                             )   COMPLAINT FOR VIOLATION OF THE
         vs.                                   )   FEDERAL SECURITIES LAWS
16                                             )
    INVENSENSE, INC., BEHROOZ ABDI and         )
17  ALAN KROCK,                                )
                                               )
18                       Defendants.           )
                                               )   DEMAND FOR JURY TRIAL
19  _____   )

20

21

22

23

24

25

26

27

28

1    Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which

2    included a review of United States Securities and Exchange Commission ("SEC") filings by

3    InvenSense, Inc ("InvenSense" or the "Company"), as well as regulatory filings and reports,

4    securities analysts' reports and advisories about the Company, press releases and other public

5    statements issued by the Company, and media reports about the Company, and Plaintiff believes that

6    substantial additional evidentiary support will exist for the allegations set forth herein after a

7    reasonable opportunity for discovery.

8                                    **NATURE OF THE ACTION**

9        1.    This is a securities class action on behalf of purchasers of the common stock of

10   InvenSense between July 29, 2014 and October 28, 2014, inclusive (the "Class Period"), seeking to

11   pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

12       2.    Defendant InvenSense designs, develops, markets and sells Micro-Electro-

13   Mechanical Systems ("MEMS") sensors, such as accelerometers, gyroscopes and microphones for

14   consumer electronics.  The Company targets sales of its products to manufacturers of smartphones

15   and tablets, console and portable video gaming devices, and other types of consumer electronics.

16       3.    InvenSense's ability to secure new customers depends on winning competitive

17   processes, known as "design wins."  The Company acknowledges in its SEC filings that "[t]hese

18   selection processes are typically lengthy" and that the "sales cycle for [its] products is long."  Due to

19   the technical nature and need for close product integration between its MEMS sensors and its

20   customer's products, InvenSense works closely with its customers both before and after a design

21   win.

22       4.    Prior to the start of the Class Period, InvenSense had developed relationships with

23   well-known electronics and mobile device manufacturers, including Samsung Electronics and LG

24   Electronics.  Even though InvenSense may have supplied chips to these reputable companies, the

25   Company had not yet announced a relationship with the "holy grail" of mobile device companies –

26   Apple, Inc. ("Apple").  Apple is a leading technology company well known for its meticulous

27   planning of products and policies on not revealing products until they are finished, polished, and

28   ready for distribution to customers.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

5. Due to the highly secretive nature of the way Apple does business, the Company was not permitted to reveal to investors that its sensors would be used in the iPhone 6. During early to mid-2014, however, based on statements by the Company and rumors from well-respected sources, investors and analysts had become confident that InvenSense had finally secured a design win with Apple for its next blockbuster product, the iPhone 6 mobile phone. It was ultimately revealed during September 2014 (approximately 6 weeks after the start of the Class Period) that InvenSense's sensors were included in the iPhone 6. Accordingly, the Company necessarily worked closely with Apple and agreed upon key contractual terms prior to the start of the Class Period.

6. On July 29, 2014, InvenSense announced financial results for the quarter ended June 29, 2014, provided guidance for the next several quarters, and made extremely positive statements about the condition of its business and near term prospects. Although Defendants may not have specifically referenced Apple or the iPhone 6 by name, Defendants' statements during the Class Period made it loud and clear to investors that InvenSense sensors would be included in the iPhone 6 and that the Company's near term guidance included a substantial amount of sales related to that product. Importantly, not only did Defendants issue strong sales guidance, but they also represented to investors that the Company's margins would be consistent with the recent past. Thus, Defendants portrayed the Company as having huge sales opportunities without any negative impact on margins or profitability.

7. Unbeknownst to investors, however, Defendants knew, or recklessly disregarded, that certain problems existed by the start of the Class Period that were, and would continue to, negatively impact the financial performance of the Company and compress margins. First, even though InvenSense sensors would be included in the iPhone 6, Apple obtained a sweetheart deal on pricing. The low price point for Apple, along with lower than average pricing for Samsung, negatively impacted the Company's profitability. Second, the Company encountered manufacturing inefficiencies associated with the development and rollout of the iPhone 6 since it was a new product. Finally, InvenSense held a large stockpile of old inventory that needed to be written off due to lack of demand. Thus, Defendants lacked a reasonable basis to assure investors that near term margins would be consistent with historical levels. Instead of revealing the true condition of the

1  Company and its prospects, Defendants hid those facts from investors and chose to issue strong

2  guidance and paint a picture of a bright future with a new mega-customer.

3         8.     On October 28, 2014, InvenSense announced disappointing financial results for the

4  quarter ended September 28, 2014, and revealed a substantial drop-off in margins due in large part to

5  low pricing for Apple and Samsung, operational inefficiencies with the iPhone 6 rollout, and a

6  charge related to old inventory.  The Company's announcements caused InvenSense shares to

7  plummet more than 25% in one day, damaging investors.

8                                 **JURISDICTION AND VENUE**

9         9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the

10  Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC

11  [17 C.F.R. §240.10b-5].

12        10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

13  §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

14        11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and

15  28 U.S.C. §1391(b), as the Company maintains is principal executive offices in this District.

16        12.     In connection with the acts alleged in this Complaint, Defendants, directly or

17  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

18  the mails, interstate telephone communications and the facilities of the national securities markets.

19                                        **PARTIES**

20        13.     Plaintiff Jim McMillan, as set forth in the accompanying certification, incorporated

21  by reference herein, purchased the common stock of InvenSense during the Class Period and has

22  been damaged thereby.

23        14.     Defendant InvenSense, Inc. designs, develops, markets, and sells MEMS gyroscopes

24  for motion tracking devices in consumer electronics.  The Company delivers motion interface

25  solutions based on its multi-axis technology that target smartphones and tablets, console and portable

26  video gaming devices, digital still and video cameras, smart TVs, navigation devices, toys, and

27  health and fitness accessories.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

15.     Defendant Behrooz Abdi ("Abdi") has served as the Company's Chief Executive Officer ("CEO") since October 2012 and has served as a director on the Company's board of directors since June 2011.

16.     Defendant Alan Krock ("Krock") served as the Company's Vice President and Chief Financial Officer ("CFO") from May 2011 until his resignation on September 2, 2014.

17.     Defendants Abdi and Krock are collectively referred to herein as the "Individual Defendants."  Defendant InvenSense and the Individual Defendants are collectively referred to herein as the "Defendants."

18.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

19.     Each of the above officers of InvenSense, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

20.     As officers and controlling persons of a publicly-held company whose shares were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded over the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the

1  Company's financial condition and performance, growth, operations, financial statements, business,

2  markets, management, earnings and present and future business prospects, and to correct any

3  previously-issued statements that had become materially misleading or untrue, so that the market

4  price of the Company's publicly-traded shares would be based upon truthful and accurate

5  information.  The Individual Defendants' misrepresentations and omissions during the Class Period

6  violated these specific requirements and obligations.

7        21.    The Individual Defendants participated in the drafting, preparation, and/or approval

8  of the various public and shareholder and investor reports and other communications complained of

9  herein and were aware of, or recklessly disregarded, the misstatements contained therein and

10 omissions therefrom, and were aware of their materially false and misleading nature.  Because of

11 their Board membership and/or executive and managerial positions with InvenSense, each of the

12 Individual Defendants had access to the adverse undisclosed information about InvenSense's

13 business prospects and financial condition and performance as particularized herein and knew (or

14 recklessly disregarded) that these adverse facts rendered the positive representations made by or

15 about InvenSense and its business issued or adopted by the Company materially false and

16 misleading.

17        22.    The Individual Defendants, because of their positions of control and authority as

18 officers and/or directors of the Company, were able to and did control the content of the various SEC

19 filings, press releases and other public statements pertaining to the Company during the Class

20 Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be

21 misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

22 their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is

23 responsible for the accuracy of the public reports and releases detailed herein and is therefore

24 primarily liable for the representations contained therein.

25        23.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of

26 business that operated as a fraud or deceit on purchasers of InvenSense common stock by

27 disseminating materially false and misleading statements and/or concealing material adverse facts.

28 The scheme: (i) deceived the investing public regarding InvenSense's business, operations,

1  management and the intrinsic value of InvenSense common stock; and (ii) caused Plaintiff and other

2  members of the Class to purchase InvenSense common stock at artificially inflated prices.

3  **CLASS ACTION ALLEGATIONS**

4      24.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

5  Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common

6  stock of InvenSense between July 29, 2014 and October 28, 2014, inclusive, and who were damaged

7  thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and

8  directors of the Company, at all relevant times, members of their immediate families and their legal

9  representatives, heirs, successors or assigns and any entity in which Defendants have or had a

10  controlling interest.

11      25.   The members of the Class are so numerous that joinder of all members is

12  impracticable.  Throughout the Class Period, InvenSense common stock was actively traded on the

13  NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can

14  only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

15  thousands of members in the proposed Class.  Record owners and other members of the Class may

16  be identified from records maintained by InvenSense or its transfer agent and may be notified of the

17  pendency of this action by mail, using the form of notice similar to that customarily used in

18  securities class actions.

19      26.   Plaintiff's claims are typical of the claims of the members of the Class as all members

20  of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law

21  complained of herein.

22      27.   Plaintiff will fairly and adequately protect the interests of the members of the Class

23  and has retained counsel competent and experienced in class action and securities litigation.

24      28.   Common questions of law and fact exist as to all members of the Class and

25  predominate over any questions solely affecting individual members of the Class.  Among the

26  questions of law and fact common to the Class are:

27          (a)   whether the federal securities laws were violated by Defendants' acts as

28  alleged herein;

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 6 -

1       (b)     whether statements made by Defendants to the investing public during the

2   Class Period misrepresented material facts about the business and operations of InvenSense;

3       (c)     whether the price of InvenSense common stock was artificially inflated during

4   the Class Period; and

5       (d)     to what extent the members of the Class have sustained damages and the

6   proper measure of damages.

7       29.     A class action is superior to all other available methods for the fair and efficient

8   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

9   damages suffered by individual Class members may be relatively small, the expense and burden of

10  individual litigation make it impossible for members of the Class to individually redress the wrongs

11  done to them.  There will be no difficulty in the management of this action as a class action.

12                          **SUBSTANTIVE ALLEGATIONS**

13      30.     The Class Period begins on July 29, 2014.  On that date, InvenSense issued a press

14  release announcing its financial results for its first fiscal quarter of 2015 for the period ended

15  June 29, 2014.  For the quarter, the Company reported net revenue of $66.7 million, a net loss of

16  $4.8 million, or ($.05) per share, and gross profit of $31.17 million.  In the press release, Defendant

17  Abdi commented on the "exciting and promising time for Invensense" and the "market share

18  increases" due to the growth of the Company's "design win portfolio," stating, in pertinent part, as

19  follows:

20          This is an exciting and promising time for InvenSense . . . ***Our design win***
            ***portfolio continues to grow, positioning us for strong market share increases in the***
21          ***coming quarters as new designs ramp into volume production***.  We continue to
            transition to a platform solution company, underscored by our announcement earlier
22          this quarter of our intention to acquire two leading sensor algorithm and software
            companies.  These highly strategic acquisitions allow us to scale our research and
23          development efforts in this area and deliver higher value solutions to our customers.
            In total, our expanding presence in key geographic markets, additional content
24          opportunities within the mobile device market and new applications for motion and
            audio sensors, such as wearables, provide healthy growth drivers through the current
25          fiscal year and beyond.[1]

26

27

28  _____
    [1]   All emphasis is added unless otherwise noted.

31.     That same evening, InvenSense held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations.  During the call, Defendants reiterated the financial results from the press release and made positive statements about InvenSense, its business, earnings and operations.  During the call, Defendant Abdi discussed the exciting opportunities expected in the near term for the Company, including "yet to be announce[d] phones," the entering of a "period of significant growth" and "overall gross margins at consistent levels," stating, in pertinent part, as follows:

> In the mobile market, we're excited to report that there are multiple smart phones that include both our 6-axis MotionTracking solution as well as our two axis OIS products.  These products include the LG G3 and Amazon Fire smart phones.  As well as *a number of yet to be announce phones*, preparing to launch across multiple geographies in the coming months.
>
> *            *            *
>
> Turning our attention to the fiscal second quarter, we're *excited to be entering a period of significant growth*.  We are *ramping into production at a number of new and existing customers* in every region, which will bring us greater diversification and scale.
>
> While we expect volume *shipments of our 6-axis MotionTracking SoCs to contribute the majority of this growth*, we also expect to achieve greater volume shipments across the majority of our motion products, including two axis OIS and 3-axis discrete gyroscopes.
>
> *            *            *
>
> Having strategically built inventory ahead of anticipated demand for our second generations 6-axis products in previous quarters, *we are now able to meet significant new customer requirements* even while we continue to add manufacturing capacity and ramp into production our third-generation 6-axis products.
>
> While we expect gross margins at some of our top-tier customers to remain under pressure, as a result of high-volume pricing, as well as lower initial manufacturing yields as we ramp new products into production, *we believe our higher value system solutions combined with our aggressive manufacturing cost reductions, will keep our overall gross margins at consistent levels*.
>
> *            *            *
>
> We are especially please[d] to see our shipments and revenue grew in North America.  Growing this quarter to be a substantial portion of our total business, driven primarily by significant share gain at several existing and new customers.

32.     During the call, Defendant Krock discussed the Company's extremely strong financial outlook for the second quarter of fiscal year 2015 and the fiscal year 2015, due in large part to new customers in the United States and China, stating, in pertinent part, as follows:

> *We see* continuing progress and strength and adoption of our products across customers and therefore *significant continuing market share gains in mobile markets*, due to our products higher performance and attractive features and size. We see this *progress at number of major customers including some representing new sizable market share gains at customers headquartered in both the United States and China*. And we believe our products strength at all these customers, offers an important opportunity to continue our unit shipment and revenue growth in fiscal periods beyond the current year.
>
> Considering these factors, *we expect FY15 Q2 revenue to be in the range of $86 million to $91 million*. To support this Q2 fiscal 2015 revenue outlook, *we currently have backlog in place representing a majority of this total current quarter revenue target*.

33.     On the call, Defendant Krock represented that the second quarter was only the tip of the iceberg for these new customers, that the third quarter looks extremely bright as well, and that margins will remain at historical levels notwithstanding the Company's growth prospects and dependence on large customers. Furthermore, even though Defendant Krock did not mention Apple by name, he described a new customer that the market correctly inferred was Apple. Defendant Krock stated, in pertinent part, as follows:

> *These Q2 FY15 outlook estimates reflect only a partial quarter estimate of the related revenue opportunities*. As these new product opportunities with both United States-based and China-based OEMs are only expected to be in production for part of our fiscal Q2. Therefore these new product opportunities can contribute significant additional amounts of revenue when in production for our entire fiscal Q3 period.
>
> We expect sales at our largest customer, Samsung Electronics, to represent mid-20% to 30% of this target, reflecting strength in applications where we have existing designs and are participating in expected new customer design launches.
>
> Additionally, we expect that LG will continue to be a 10%, September quarter customer as in the June quarter. Potentially together with at least one China-based OEM depending upon the level of total Q2 revenue achieved. *And that we will have at least one new 10% customer as of the September and future quarters*.
>
> As mentioned, *some* of the opportunities in the United States and China *represent near-term significant market share gains and others represent new inertial sensor, especially gyroscope attach rate opportunities*. We also expect new mobile market sensor applications such as microphones and OIS to contribute to future revenue growth, albeit with somewhat uncertain timing.
>
> Product mix for the current quarter continues to favor our highest volume mobile customers. And *we should generate a total gross margin in line with recent levels.*

*We believe that on a GAAP basis our Q2 FY15 gross margin will be in a range around 48% continuing to now modestly reflect the impact of additional cost of amortization of intangibles acquired.*

On a *non-GAAP basis, Q2 FY15 gross margin is expected to be consistent with recent past quarters that is in the range around 50%.* In future quarters, lower-cost of products, additional production volumes, and improving product yields should contribute to a favorable impact on our gross margin. *Therefore our target non-GAAP gross margin remains unchanged.*

\*       \*       \*

We expect our spending in margin opportunities for our FY15 -- *we continue to expect gross margins generally consistent with our recent past and FY14 on a non-GAAP basis and on a GAAP basis in a range of around approximately 48%.*

\*       \*       \*

And therefore earnings per share range around $0.80 per share on a non-GAAP basis and on a GAAP basis we expect earnings per share in the range around 35% -- $0.35 per share. Of course both earnings estimate exclude any foreseen events or activities, which could arise in the future.

34.     In response to a question about the potential downside due to a decrease in orders from certain existing customers, Defendant Krock stated that a "larger new customer" (*i.e.*, Apple), would more than offset any declines, stating, in pertinent part, as follows:

As Behrooz says, there's a lot of different new products coming into production and some potential additional new content to offset any potential change in unit volumes that people are concerned with.

*So, with a larger newer customer that's going to be, clearly 10% or greater of revenue, the percent that any one of the other existing customers occupy will drop off some. But generally levels of revenue and opportunities are similar going forward, especially considering additional potential content that may be in some of the newer products.*

35.     On the call, Defendant Krock responded to a question about potential pricing pressures from existing customers and stated that "there's no one customer with any particular window of pricing that's relevant." The exchange with the analyst is set forth, in pertinent part, below:

**Mark Delaney** - *Goldman Sachs* – Analyst

Can you also discuss to what extent pricing is locked in or pretty firm for *new product launches in and the next quarter or two*? Or can customer still come in and ask for larger pricing declines?

**Alan Krock** - *InvenSense Inc* – CFO

There's a paradigm that set.  Many of our customers have unique schedules for negotiation of pricing.  As mentioned we have now substantial exposure and if it's got a Gyro function in it's a smartphone, a substantial share of the market.  So any one customer can always be jockeying for a better price, as they all do at all times.

But generally it's about the value of these sensor function in the market with the Gyro and integrated sensor attached.  ***So there's no one customer with any particular window of pricing that's relevant.***

Some of the Asian ones are quarterly, some of the others are semi annual, and others even longer than that.  So there's just a very broad exposure now that we have to integrate sensors with the Gyro function included in smart phones, maybe half the market or something like that.

36.     Analysts were very encouraged about the Company's prospects after the conference call, assumed that Apple was the new U.S. based customer, and believed that business from Apple for the iPhone 6 was incorporated into the Company's guidance, including statements about margins. For example, a research report from Ascendiant Capital Markets, LLC dated July 30, 2014, stated, in pertinent part, as follows:

As expected INVN delivered a strong June quarter and provided further evidence that supports our belief of the initial participation in Apple's (AAPL, N/R) portfolio, likely in both the iPhone6 and wearables.

*        *        *

The only downside of adding a customer the size of Apple, and possibly Xiaomi, is that these unit sizes typically come with volume discounts that limit gross margin upside.  However, ***now that we believe Apple is being incorporated into the firm's guidance for September and the full-year, gross margins look to be stabilizing around the 50% mark, and we believe should set a new base for the company to improve on through growing yields and cost reductions***.

37.     On August 7, 2014, InvenSense filed with the SEC its Form 10-Q, signed and/or certified by Defendants Abdi and Krock, for the quarter ended June 29, 2014 (the "1Q15 Form 10-Q").  The 1Q15 Form 10-Q, among other things, reiterated the financial results reported by the Company on July 29, 2014.

38.     On August 25, 2014, the Company announced in a press release that, effective September 2, 2014, Defendant Krock would be resigning from his employment at InvenSense, Mark P. Dentinger would succeed Krock as vice president and CFO, and that Krock would serve as a special advisor to help with the transition through October 31, 2014.  On September 4, 2014, the

1   Company filed a Form 8-K with the SEC attaching Krock's separation agreement, which contains a

2   non-disclosure clause and provides that the Company is to pay him severance of $175,000 and a

3   consulting fee of $25,000 for the months of September and October 2014.

4         39.   On September 9, 2014, Apple announced the iPhone 6 and 6 Plus, which contained an

5   InvenSense MEMS sensor.

6         40.   On September 18, 2014, InvenSense filed with the SEC a Form 8-K which reported

7   that the Company held its annual meeting of stockholders on that day and that Defendant Abdi and

8   Eric Stang were elected as directors to serve until 2017.

9         41.   Defendants' statements referenced above in ¶¶30, 31, 32, 33, 34, 35 were each

10  materially false and misleading when made because they misrepresented or failed to disclose the

11  following adverse facts, which were known to Defendants or recklessly disregarded by them:

12        (a)   the Company had entered into an agreement with Apple to supply sensors for

13  the iPhone 6 and iPhone 6 plus at heavily discounted prices compared to other customers;

14        (b)   the low prices charged to Apple, along with low prices charged to Samsung,

15  had, and would continue to, negatively impact the Company's margins;

16        (c)   InvenSense encountered manufacturing problems and inefficiencies which

17  negatively impacted margins;

18        (d)   Defendants lacked a reasonable basis to provide its stated near term financial

19  guidance or to assure investors that margins would be consistent with historical levels;

20        (e)   the Company's Form 10-Q for the first quarter of 2015 failed to disclose then

21  presently known trends, events or uncertainties associated with the Company's sales and margins

22  that were reasonably likely to have a material effect on InvenSense's future operating results; and

23        (f)   as a result of the foregoing, Defendants lacked a reasonable basis for their

24  positive statements about the Company's financial performance and outlook during the Class Period.

25

26        42.   On October 28, 2014, the Company issued a press release announcing its financial

27  results for its second fiscal quarter ended September 28, 2014 including net revenue of $90.2 million

28  and net loss of $6.868 million.  The Company also reported, among other things, disappointing

GAAP gross margins of only 35% and non-GAAP gross margins of 37%, compared with GAAP gross margins of 47% and non-GAAP gross margins of 50%, in the first quarter of fiscal 2015.  The press release stated, in pertinent part, as follows:

> Gross margin determined in accordance with U.S. generally accepted accounting principles (GAAP) for the second quarter of fiscal 2015 was 35 percent, compared with 47 percent for the first quarter of fiscal 2015.  GAAP gross margin for second quarter fiscal 2015 included stock-based compensation and related payroll taxes, and amortization of acquisition intangibles.

> Excluding these items, non-GAAP gross margin for the second quarter fiscal 2015 was 37 percent, compared with 50 percent for the first quarter of fiscal 2015.  The sequential decrease in gross margin was primarily attributable to two factors: a non-recurring inventory charge largely related to earlier generations of the company's products that reduced the gross margin by approximately eight percentage points, and a shift in revenue mix towards lower margin, high volume customers that reduced the gross margin by approximately five percentage points.

43.     Later that evening, the Company held a conference call for analysts and provided additional information about the Company's performance.  During the conference call, the Company's new CFO, Mark Dentinger, discussed the Company's disappointing margins, stating, in pertinent part, as follows:

> Most of our Q2 performance was within our expectations with the Company issued guidance early in Q2, except for gross margins.  The lower than expected gross margins had the effect of reducing our non-GAAP EPS by about $0.11.

> *     *     *

> There were three primary factors contributing to the lower gross margin performance this quarter.

> ***First, we recorded approximately $7.4 million in adjustments in Q2, mostly to write down earlier generation inventory that is now excess or obsolete***.  These inventory write-downs resulted in 8-point margin reduction from our Q1 actuals.  We do not expect most of these adjustments to repeat in Q3.

> ***Second, while unit volumes exceeded our expectations, a greater than anticipated contribution of this quarter's revenue came from our largest customers, and these customers generate lower average selling prices***.  We also sold some of our older product at prices that diluted our margins in Q2.  The combinations -- the combination of these pricing issues resulted in a 3 percentage point quarter over quarter decline in gross margin.

> ***We expect that the customer mix issue will continue for the rest of the fiscal year and we have factored this expectation into our Q3 guidance***.

> ***Finally, our yielded manufacturing costs, especially for our newer products, were higher than we expected and this lowered our gross margin by 2 percentage points in Q2***.  We also expect this phenomenon to continue into Q3.

1          *     *     *

2   Looking towards Q3, we are estimating that total revenue will be within a range of
    $108 million to $115 million, with a customer and market mix approximately what
3   we experienced in Q2. As a result, our expectations for non-GAAP gross margins in
    fiscal Q3 is a range between 46% and 47%.

4

5   Our Q3 non-GAAP gross margin guidance presumes that most of the inventory
    adjustments we recorded in Q2 will not be repeated. The margin guidance does
6   presume some of the pricing pressure resulting from our mix of business towards
    larger customers and most of our cost pressure will continue.

7   Non-GAAP operating expenses are expected to rise by about $2 million from Q2
    with R&D expenses forecasted at about $19 million and SG&A expenses at
8   $10 million. The Q3 increase in operating expenses takes into consideration a full
    quarter of expenses for TPI and Movea. Our non-GAAP net other expense and our
9   tax rate should be about flat with Q2.

10  Non-GAAP EPS should be a range between $0.17 and $0.21 per share, assuming an
    average share count of about 95 million. If you are modeling us on a GAAP basis,
11  our gross margin should be between 43% and 44%. Our operating margin should be
    between 8% and 12%, and our GAAP EPS should be between $0.06 and $0.10 in
12  Q3.

13          44.     During the call, Defendant Abdi and Dentinger responded to a question from an

14  analyst about margins, stating, in pertinent part, as follows:

15  **Ruben Roy** - *Piper Jaffray* – Analyst

16  Can you maybe walk us through some more details on some of the moving parts
    around the gross margin? You gave us guidance back in late July and I'm wondering
17  what some of the changes were during the quarter, around ASPs and yields, that you
    hadn't seen when we got the original guidance.

18

19  **Mark Dentinger** - *InvenSense, Inc.* – CFO

20  We were a little surprised by the strength of the contribution from our large
    customers, which, on general, bring lower gross margins. And, as a result of that, we
    felt a little bit of that pressure.

21

22  Second, we did move some older material at reduced margins during the quarter that
    we don't expect to repeat going forward. And we are still digesting some of the cost
23  pressure from ramping up the production with the new customers. So the
    combination of those three factors really had us about 5 points lower than what we
    were calling as we entered the quarter.

24

25  And, as I indicated in my guidance, we do expect some of that pressure to continue
    as we move into Q3. But we are forecasting that there will be an improvement off of
26  what would be the, quote-unquote, adjusted 45 points of gross margin as we move
    into Q3. And we are looking at 46% to 47% margins for this quarter.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 14 -

**Behrooz Abdi** - *InvenSense, Inc.* – President and CEO

This is Behrooz. Let me add a little bit more color. As we talked at the last earnings call, what we said was that, to the extent that our tier 1 customer mix changes and they become more dominant, that it will be more difficult to hit the gross margin early on, until we get to full production yielded and kind of a steady-state run rate.

And, if you look at our business mix, the top two customers are more dominant this past quarter and the current quarter than we anticipated when we started. The rest of the market -- the rest of the customers and product lines are either at or well above the corporate goal in terms of gross margin. So it is really the mix, as Mark mentioned, is more than anticipated towards the tier ones.

45.     During the call, Defendant Abdi responded to a question from the same analyst about pricing dynamics with customers, stating, in pertinent part, as follows:

**Ruben Roy** - *Piper Jaffray* – Analyst

Thanks for that. I wondering, on sort of the pricing negotiations, I mean, are there pricing dynamics over the course of three or six months? Or are they -- how does that work? I'm trying to figure out if there are additional ASP-related margin impacts that we might expect over the next couple of quarters.

And then, I guess, as a follow-up, the near-term improvement that Mark discussed for the December quarter, is that all yield based?

**Behrooz Abdi** - *InvenSense, Inc.* – President and CEO

Yes. Some of them are yield based; some of them are just, again, based on the pricing given to some of the customers to get the revenue and the market and to really get that going. But, in terms of the pricing, it really depends on the customer.

There are customers that, even tier ones, that when we set the price roadmap, pretty much done for the year, for the next year. So, what we anticipate in terms of going forward, it is already baked in. And then there are customers, as you know, that negotiate on a quarterly basis and that is what we have been used to in the past. And, again, we make some assumption around those in our prediction of pricing and gross margins.

46.     On the call, Dentinger responded to another questions about margins from a different analyst, stating, in pertinent part, as follows:

**Joe Moore** - *Morgan Stanley* – Analyst

I wanted to follow up on the customer concentration issue, that you said customers -- if I heard this right -- greater than 10% of revenues had only moved up from 52% last quarter to 55% this quarter. I was a little bit surprised by that, given that you had brought up a new customer, and also that you guys were surprised it, by the shift when it doesn't seem like it was that big. Was it just the two OEMs that were the problem or was there some other issue?

1  **Mark Dentinger** - *InvenSense, Inc.* – CFO

2  Let me answer them in reverse order, Joe. It was just the two OEMs -- the large
   OEMs that created most of the pricing pressure. The other phenomenon -- it is a
3  little bit more subtle.

4  It is true that our contribution from 10% customers moved from 52% to 55% during
   the quarter, but there were more than two customers contributing to the 52% in Q2 --
5  or excuse me, in Q1. So we only had two customers contributing in Q2, so there was
   a pretty substantial move inside the 10% customers upstream to the lower margin
6  arena.

7       47.     In response to these announcements on October 28, 2014, the price of InvenSense

8  shares declined from $21.48 per share prior to the announcements, to close on October 29, 2014 at

9  $16.08 per share, or a drop of 25%, on extremely heavy trading volume.

10      48.     Analysts covering InvenSense were dissatisfied with the Company's poor financial

11 results and margin compression. For example, an October 29, 2014 research report characterized the

12 Company as having a "[d]isappointing quarter," and stated that '[i]t's going to take time for

13 confidence to be restored." The report further stated, in pertinent part, as follows:

14 **Our take**: Disappointing quarter. We had forecast higher revenues and lower GMs
   vs. company guidance, and they fell short of our estimate on both counts as average
15 selling prices, principally to Apple which we estimate was 31% of sales in the qtr,
   were lower . . .
16
   **What happened**: Non gaap eps of $0.06 on $90mn revs (vs. MSe $0.20 / $96mn and
17 consensus $0.16 / $90mn). Gross margins were 34.7% vs. 50% guidance and our
   estimate of 48%; excluding an 8 point impact from inventory writedown, GMs would
18 have been 42.7%, still quite disappointing. We believe Apple ASPs were even lower
   than we had forecast, and INVN initial manufacturing yields weren't great. Apple
19 and Samsung combined were 55% of revenues. Opex was slightly higher after
   taking into consideration one off expenses for TPI and Movea. We model GAAP
20 operating margins at 11.5% in 3q15. December qtr guidance was for revs $108-115
   (we were $121, consensus $116), gross margins 46-47% (we were 48%), and higher
21 opex and share count than we had modelled.

22 **Why gross margins were worse**. The company cited higher volumes from the top 2
   customers, Apple and Samsung, who are 55% of revenues, but we believe those
23 customers were in line with our model; overall revenues were only slightly higher
   than forecast. Our sense is that the company's plan to achieve margin improvement
24 while ramping Apple required near perfect yields, but that proved too optimistic as
   meeting quality requirements with a new product required bringing yields down. We
25 were not confident in prospects for margin improvement while ramping Apple, but
   are still surprised by the magnitude of the shortfall; it's somewhat healthy that GM
26 targets are more achievable. Having said that, we are discouraged that opex and
   share count continue to rise faster than the company's forecast, with R&D up 166%
27 in 5 qtrs (partly due to M&A).

28

49.     An October 29, 2014 article in Barron's entitled "InvenSense Plunges 24%: Crushed by Lower Prices in Apple, Samsung Wares," discussed the Company's stock drop after its earnings release, stating, in pertinent part as follows:

> Shares of sensor maker InvenSense (INVN) are down $5.22, or 24%, at $16.26, after the company yesterday afternoon reported fiscal Q2 revenue and earnings per share that missed analysts' expectations, and forecast results this quarter lower as well.
>
> Revenue in the three months ended in September rose 27% to $90.2 million, missing consensus of $90.7 million, and EPS of 5 cents was well below consensus for 16 cents.
>
> The company forecast revenue of $108 million to $115 million this quarter, and EPS of 17 cents to 21 cents, missing the Street's average estimate for $117 million and 31 cents.
>
> **Gross margin** declined from 50% a year earlier to 37%, on a non-GAAP basis.
>
> **CEO Behrooz Abdi** said it was an "exciting time" for the company, noting record revenue, and cited a "full portfolio of differentiated products that we believe will provide meaningful growth opportunity for years to come."
>
> **CFO Mark Dentinger** on the conference call said InvenSense was selling into products with lower average selling prices, crimping InvenSense's own prices and margins.
>
> > *While unit volumes exceeded our expectations, a greater than anticipated contribution of this quarter's revenue came from our largest customers, and these customers generate lower average selling prices. We also sold some of our older product at prices that diluted our margins in Q2. The combinations – the combination of these pricing issues resulted in a 3 percentage point quarter over quarter decline in gross margin. We expect that the customer mix issue will continue for the rest of the fiscal year and we have factored this expectation into our Q3 guidance.*
>
> The stock has gotten three downgrades this morning, that I can see, from Piper Jaffray, Pacific Crest, and Northland.
>
> Pac Crest's John Vinh, cutting his rating, to Sector Perform from Outperform, writes that "more things went wrong than right."
>
> InvenSense didn't "execute" well, he thinks, but also its dominant market share in products from Apple (AAPL), and Samsung Electronics (005930KS) actually hurt, not helped.
>
> He thinks the company probably saw pressure on pricing from some Apple products:
>
> > *Despite having secured a dominant position at Apple and Samsung, indeed, 100% share, InvenSense executed poorly in what was anticipated to be one of the strongest quarters in the company's history. Instead, price pressures from Apple and Samsung and the acknowledgment of potential second-sourcing significantly reduce our confidence that InvenSense will be able to sustain growth and avoid multiple compression [ . . . ] Pricing pressure associated with Apple business is*

- 17

*having a substantial impact on InvenSense's margin expectations. The company indicated that it expects pricing pressures will continue for the next several quarters, which lowers its gross margin outlook to the high 40%s from 50%-55%. As FQ3 (Dec.) is expected to have similar product and customer mix, InvenSense guided gross margin for the quarter to be 46%-47%. The company remains confident that its new product launches in F2016 will help improve the margin profile. However, we anticipate that lower gross margin will contract valuation multiples.*

[Emphasis in original.]

50.     The market for InvenSense common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, InvenSense common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased InvenSense common stock relying upon the integrity of the market price of InvenSense common stock and market information relating to InvenSense, and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of InvenSense common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about InvenSense's business, products and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of InvenSense and its business, products and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class

purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

53.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding InvenSense, their control over, and/or receipt and/or modification of InvenSense's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning InvenSense, participated in the fraudulent scheme alleged herein.

54.     Defendants were further motivated to engage in this fraudulent course of conduct in order to allow Company insiders to sell shares of their personally-held InvenSense common stock at inflated prices, yielding them proceeds of more than $5.3 million during the Class Period:

**InvenSense Inc (INVN)**
Insider Sales: 7/29/14 - 10/28/14

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Goehl, Daniel | Officer | 15-Aug-2014 | 3,750 | $24.95 | $93,563 |
| Krock, Alan F | Chief Financial Officer | | | | $41,150 |
| | | 18-Aug-2014 | 1,666 | $24.70 | |
| | | 27-Aug-2014 | 69,650 | $25.03 | $1,743,340 |
| | | 27-Aug-2014 | 25,000 | $24.88 | $622,000 |
| | | 27-Aug-2014 | 5,350 | $25.03 | $133,911 |
| | | 28-Aug-2014 | 25,000 | $25.33 | $633,250 |
| | | | 126,666 | | $3,173,650 |
| Lloyd, Stephen | Officer | 18-Aug-2014 | 1,428 | $24.70 | $35,272 |
| | | 08-Sep-2014 | 10,833 | $24.21 | $262,267 |
| | | | 12,261 | | $297,539 |

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

| | | | | | |
|---|---|---|---|---:|---:|
| Shah, Amit | Director | 06-Aug-2014 | 2,171 | $23.95 | $51,995 |
| | | 06-Aug-2014 | 28 | $23.95 | $671 |
| | | 06-Aug-2014 | 14 | $23.95 | $335 |
| | | 11-Aug-2014 | 256 | $24.60 | $6,298 |
| | | 11-Aug-2014 | 19,616 | $24.60 | $482,554 |
| | | 11-Aug-2014 | 128 | $24.60 | $3,149 |
| | | | 22,213 | | $545,001 |
| Tachner, Adam H | General Counsel | 16-Sep-2014 | 13,930 | $22.25 | $309,943 |
| Wilson, Timothy M | Director | 15-Sep-2014 | 38,808 | $23.07 | $895,301 |
| **TOTAL** | | | | | **$5,314,996** |

55.     Defendant Krock personally reaped more than $3 million from sales of Company shares during the Class Period.

56.     Furthermore, Defendant Abdi was motivated to hide the true state of affairs of the Company from investors to ensure that he would be re-elected to the Company's board of directors at the September 18, 2014 meeting of shareholders.

**LOSS CAUSATION**

57.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of InvenSense common stock and operated as a fraud or deceit on Class Period purchasers of InvenSense common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of InvenSense common stock declined significantly as the prior artificial inflation came out of the Company's common stock price.

58.     As a result of their purchases of InvenSense common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused InvenSense common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $25.85 per share on August 29, 2014.

59.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of InvenSense's business, products and operations.  When the truth about the

1   Company was revealed to the market, the price of InvenSense common stock fell significantly.  This

2   decline removed the inflation from the price of InvenSense common stock, causing real economic

3   loss to investors who had purchased InvenSense common stock during the Class Period.

4          60.     The decline in the price of InvenSense common stock after the corrective disclosure

5   came to light was a direct result of the nature and extent of Defendants' fraudulent

6   misrepresentations being revealed to investors and the market.  The timing and magnitude of the

7   price decline in InvenSense common stock negates any inference that the loss suffered by Plaintiff

8   and the other Class members was caused by changed market conditions, macroeconomic or industry

9   factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

10         61.     The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members

11  was a direct result of Defendants' fraudulent scheme to artificially inflate the price of InvenSense

12  common stock and the subsequent significant decline in the value of InvenSense common stock

13  when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

14
15
16  62.     At all relevant times, the market for InvenSense common stock was an efficient

    market for the following reasons, among others:

17
18         (a)     InvenSense common stock met the requirements for listing, and was listed and

19  actively traded on the NASDAQ, a highly efficient, electronic stock market;

20         (b)     as a regulated issuer, InvenSense filed periodic public reports with the SEC

21  and the NASDAQ;

22         (c)     InvenSense regularly communicated with public investors via established

23  market communication mechanisms, including regular disseminations of press releases on the

24  national circuits of major newswire services and other wide-ranging public disclosures, such as

25  communications with the financial press and other similar reporting services; and

26         (d)     InvenSense was followed by securities analysts employed by major brokerage

27  firms who wrote reports which were distributed to the sales force and certain customers of their

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1  respective brokerage firms.  Each of these reports was publicly available and entered the public

2  marketplace.

3       63.     As a result of the foregoing, the market for InvenSense common stock promptly

4  digested current information regarding InvenSense from all publicly available sources and reflected

5  such information in the prices of the common stock.  Under these circumstances, all purchasers of

6  InvenSense common stock during the Class Period suffered similar injury through their purchase of

7  InvenSense common stock at artificially inflated prices and a presumption of reliance applies.

8                                    **COUNT I**

9                    **Violation of Section 10(b) of the Exchange Act**
                     **and Rule 10b-5 Promulgated Thereunder**
10                          **Against All Defendants**

11      64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set

12  forth herein.

13      65.     During the Class Period, Defendants disseminated or approved the materially false

14  and misleading statements specified above, which they knew or deliberately disregarded were

15  misleading in that they contained misrepresentations and failed to disclose material facts necessary

16  in order to make the statements made, in light of the circumstances under which they were made, not

17  misleading.

18      66.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

19  statements of material fact and/or omitted to state material facts necessary to make the statements not

20  misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud

21  and deceit upon the purchasers of the Company's common stock during the Class Period.

22      67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

23  the market, they paid artificially inflated prices for InvenSense common stock.  Plaintiff and the

24  Class would not have purchased InvenSense common stock at the prices they paid, or at all, if they

25  had been aware that the market prices had been artificially and falsely inflated by Defendants'

26  misleading statements.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

68.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of InvenSense common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of InvenSense within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of InvenSense, and their ownership of InvenSense stock, the Individual Defendants had the power and authority to cause InvenSense to engage in the wrongful conduct complained of herein.

71.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

DATED:  January 7, 2015

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN WILLIAMS


                    *s/Shawn Williams*
                  SHAWN WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
swilliams@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

*Attorneys for Plaintiff*

I:\Admin\CptDraft\Securities\Cpt Invensense.docx