ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
– and –
TOR GRONBORG (179109)
IVY T. NGO (249860)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
ingo@rgrdlaw.com

Lead Counsel for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re INVENSENSE, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| This Document Relates To: | |
| ALL ACTIONS. | |

Case No. 3:15-cv-00084-JD

CLASS ACTION

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

1032111_1

1    Lead Plaintiff the Vossen Group ("Lead Plaintiff" or "the Vossen Group") alleges the

2    following based upon personal knowledge as to itself and its own acts, and upon an investigation

3    conducted by and through Lead Plaintiff's attorneys, which included, *inter alia*, a review of the

4    United States Securities and Exchange Commission ("SEC") filings made by InvenSense, Inc.

5    ("InvenSense" or the "Company"), Company releases, conference calls, public statements issued by

6    defendants, media reports, analyst reports and consultation with persons familiar with InvenSense's

7    business, including former employees of InvenSense. Lead Plaintiff believes substantial additional

8    evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity

9    for discovery.

10   **I.    NATURE OF THE ACTION**

11        1.    This is a federal securities class action brought against InvenSense and two of its

12   senior officers for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934

13   Act") and SEC Rule 10b-5 promulgated thereunder. This action is brought on behalf of all persons

14   or entities who purchased InvenSense common stock between July 29, 2014 and October 28, 2014,

15   inclusive (the "Class Period"). Lead Plaintiff brings this action against InvenSense, its Chief

16   Executive Officer ("CEO") and President Behrooz Abdi, and its former Chief Financial Officer

17   ("CFO") Alan Krock (collectively, "Defendants"). This action concerns Defendants' misleading

18   statements and material omissions on July 29, 2014 and August 7, 2014 regarding InvenSense's

19   excess and obsolete inventory and the Company's pricing and margin on chips to be sold to Apple

20   Inc. ("Apple") for use in the iPhone 6 and 6 Plus.

21   **II.    BACKGROUND AND SUMMARY OF THE ACTION**

22        2.    InvenSense was founded in 2003 by Steve Nasiri. Under Mr. Nasiri's leadership, the

23   Company was a pioneer in the advancement of motion processing solutions and micro-electro-

24   mechanical system ("MEMS") technology. The Company's MEMS chips are used to track complex

25   user motions through motion sensors, including microscopic gyroscopes and accelerometers, based

26   upon the patented Nasiri-Fabrication platform. As it grew under Mr. Nasiri, InvenSense targeted its

27   MEMS chips to manufacturers of consumer electronics, such as portable video gaming devices and,

28   increasingly after 2007, smartphones and tablets.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:15-cv-00084-JD                                                              - 1 -

3.      From its founding, InvenSense's ability to secure new customers depended on winning competitive processes, known as "design wins," over its key competitors – particularly the Company's larger and more-established rival STMicrolectronics N.V. ("STMicro"). As InvenSense acknowledged in its SEC filings, "[t]hese selection processes are typically lengthy," the "sales cycle for [its] products is long," and "all of [its customers] purchase [its] products on a purchase order basis." *See, e.g.*, Form 10-K for FY14[1] filed with the SEC on May 29, 2014. The MEMS chips designed by InvenSense were typically highly customized and for a specific product integration. Accordingly, while Mr. Nasiri was CEO and President, InvenSense followed a policy of only beginning volume production for a customer after achieving a design win.

4.      The market for MEMS chips began to explode following the introduction of Apple's original iPhone in June 2007, one of the first smartphones to use a multi-touch interface. Within 18 months of the iPhone's introduction, smartphone sales had gone from essentially zero to more than 139 million units a year. Total sales of smartphones, nearly all of which contained motion sensing technology, exceeded 500 million units by the end of 2009, and Apple's iPhone was widely acknowledged to be the preeminent and most profitable smartphone on the market. InvenSense's chips, however, were not included in the original iPhone or follow-on iPhone 3, and the Company was having difficulties breaking into the smartphone market. As Mr. Nasiri acknowledged, "InvenSense didn't yet have the capacity to try to sell to Apple (AAPL) when Apple was building its first iPhones and iPads with motion-sensing features like touch-screens and compasses." Amy Reeves, "Invensense, Wii Motion-ChipMaker, Up in IPO Debut," *Investor's Business Daily*, November 16, 2011.

5.      By 2010, Mr. Nasiri and InvenSense were working with Apple to develop a MEMS chip for the iPhone 4. While the chips were technologically sound and had best-in-class capabilities, InvenSense lost the iPhone 4 contract to STMicro over concerns that the Company was too small to have the capacity or financial resources to support the volume of chips Apple demanded. As a result

---

[1]   For financial reporting, InvenSense employs a fiscal year ending on the Sunday closest to March 31, and its fiscal quarters are 13 weeks long. The 2014 fiscal year ("FY") ended March 30, 2014, the first quarter of FY15 ended June 29, 2014 ("1Q15") and the second quarter of FY15 ended September 28, 2014 ("2Q15").

1    of once again being left out of the iPhone, InvenSense was having difficulties striking deals with

2    other major mobile device manufacturers for the Company's high-end, high-margin chips.

3    According to Mr. Nasiri, other manufacturers "'weren't willing to take any bets on any new

4    functions unless Apple had embraced it.'"   Karsten Strauss, "Microchips Maker InvenSense Wants a

5    Slice of Apple," *Forbes India*, November 14, 2013 ("*Forbes* article").

6         6.      To address Apple's concerns about capacity and financial resources, in November

7    2011, InvenSense went public and raised $75 million in its initial public offering.  At this time,

8    Defendant Abdi was a director on the Company's Board of Directors and Mr. Nasiri was still the

9    CEO and President.  Through the offering, it was thought that InvenSense would be in a much better

10   position to land a design win for the forthcoming iPhone 5.

11        7.      When Apple launched the iPhone 5 on September 21, 2012, however, it was revealed

12   that Apple had, once again, selected a MEMS chip from STMicro over any InvenSense product.

13   Little more than one month later, despite his success in expanding the Company's sales and

14   customer base to mobile device manufacturers other than Apple, Defendant Abdi and InvenSense's

15   Board ousted Mr. Nasiri.  Abdi installed himself as the CEO and President of the Company with a

16   promise to get InvenSense's chips into an Apple iPhone.

17        8.      The next generation of the iPhone, the iPhone 5S and 5C, was scheduled to be

18   released in September 2013.  Once again, InvenSense was given the opportunity to work with Apple

19   to develop a MEMS chip specifically for the 5S and 5C handsets.  While under Mr. Nasiri,

20   InvenSense had adhered to the policy of not beginning volume production of a chip until after

21   achieving a design win, Abdi was desperate to make good on his promise to get an InvenSense chip

22   into an iPhone.  To allay any concerns Apple had about InvenSense's manufacturing capacity,

23   InvenSense began volume production of 3-axis MEMS sensors for the iPhone 5S and 5C before

24   Apple had committed to putting the chips into the handsets.  By the end of June 2013, InvenSense

25   had built up an inventory of approximately 20 million 3-axis MEMS chips that were specifically for

26   the iPhone 5S and 5C.  Analysts and industry observers noted the growth in InvenSense's reported

27   inventory and speculated that it was the result of the Company finally getting into the newest version

28   of the iPhone.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:15-cv-00084-JD                                                                              - 3 -

9.      When the iPhone 5S and 5C were launched on September 20, 2013, it was revealed that Apple had, again, gone with a MEMS chip from STMicro.  Even with the pre-design win production of approximately 20 million chips, Abdi had failed to overcome the perception that InvenSense did not have the capacity to fully supply Apple while meeting commitments to other customers.  As a result, InvenSense was left with approximately 20 million 3-axis MEMS chips specifically designed for the iPhone 5S and 5C.  Given the unique nature of the chips, the only viable market other than Apple was white box (generic) Chinese handset vendors and Chinese toy manufacturers.  These manufacturers had limited needs (no more than a few million chips) could only utilize a small percentage of the chip's capabilities and would only pay, at most, a few cents more than the cost the chips (approximately $0.44 per chip).  Nevertheless, InvenSense only wrote down an "insignificant" amount of inventory in FY14.

10.      Despite failing to obtain the iPhone 5S and 5C design win, Abdi continued to insist that he would get InvenSense chips into an Apple product.  In the November 14, 2013 *Forbes* article titled "Microchips Maker InvenSense Wants a Slice of Apple," Abdi assured investors that "'[y]ou will see a very marked difference in the future of the company,'" which the article suggested could be "in the next teardown of an Apple device."  Given what had happened to InvenSense's founder and former CEO, Mr. Nasiri, however, Abdi knew that the window to make good on his assurances was shrinking.

11.      Rumors about the launch of Apple's iPhone 6 were circulating publicly as early as December 2013.  To prevent another design loss with Apple, Abdi knew that InvenSense had to demonstrate that it could satisfy all of its obligations to other customers while committing virtually all of its capacity to meeting Apple's demands.  This meant that by the time Apple awarded the MEMS chip design win for the iPhone 6 and 6 Plus, in or about June 2014, InvenSense would need to be able to show that inventory and capacity were not a concern.  To do that, InvenSense kept nearly all of the approximately 20 million iPhone 5S and 5C chips on its books at full value and reported significant increases in the value of the Company's inventory for the quarters ended December 29, 2013 and March 30, 2014 (3Q14 and 4Q14).

1    12.    In a press release issued by the Company on May 1, 2014, Defendant Abdi stated that

2  part of the "'increased investment in research and development'" in 2014 supported "'extensive new

3  product and customer qualification activities'" and explained that the Company had "'made a

4  strategic decision in both fiscal Q3 and Q4 to build inventory in our core products.  This positions us

5  to increase our capacity in a more linear fashion at optimum cost, while we prepare for multiple

6  significant customer ramps in the coming quarters.'"  Form 8-K filed with the SEC on May 1, 2014.

7  Abdi provided more detail in a May 26, 2014 interview with *The Wall Street Transcript*, describing

8  the built-up inventory as "products that we feel that have very low risk because they are broad-based

9  products, and a lot of customers and healthy demand.  And we built enough inventory to make sure

10  that when the bump comes in, when the huge ramp comes in the second half of the year, we are well-

11  prepared for that."  Company Interview, Behrooz Abdi, *The Wall Street Transcript*, May 26, 2014.

12    13.    The public campaign touting InvenSense's growing inventory of in-demand products

13  achieved its goal of addressing Apple's concerns.  On or around June 24, 2014, InvenSense finally

14  secured a design win with Apple when the Company's 6-axis MEMS chip was selected for the

15  iPhone 6 and 6 Plus.  Apple's contract with InvenSense (as with other suppliers) required that the

16  design win be kept confidential until the iPhone 6 products were released, and such nondisclosure

17  agreements with Apple called for penalties as high as $50 million per violation.  Apple's purchase

18  order for 6-axis MEMS chips for the iPhone 6 and 6 Plus also set pricing below InvenSense's other

19  "10% customers" (customers whose purchases were 10% or more of InvenSense's sales volume),

20  reducing InvenSense's margins on chips sold to Apple to approximately 40% as compared to the

21  approximately 50% margins it obtained, on average, from Samsung, LG and smaller customers.

22  Apple also had the ability to rescind the purchase order if it was determined that InvenSense could

23  not meet Apple's demands for its iPhone 6 products.

24    14.    On the start of the Class Period, July 29, 2014, InvenSense announced financial

25  results for the quarter ended June 29, 2014 (1Q15) and hinted at the fact that the Company had

26  finally scored a design win with Apple.  Defendants Abdi and Krock told investors that InvenSense

27  was entering a "period of significant growth," would "have at least one new 10% customer as of

28  September" (the iPhone 6 was scheduled for release in September 2014) and had made progress at

1  "major customers" "headquartered in both the United States and China" (during 2014, Apple was the

2  only major smartphone manufacturer headquartered in the United States).

3       15.    As they had with Apple, Defendants assured the market that InvenSense had the

4  capacity to meet Apple's demands for the iPhone 6 and 6 Plus while also meeting obligations to the

5  Company's other customers.  Abdi specifically told investors that "[h]aving strategically built

6  inventory ahead of anticipated demand for our second generation 6-axis products in previous

7  quarters, we are now able to meet significant customer requirements even while we continue to add

8  manufacturing capacity and ramp into production our third generation 6-axis products."  Q1 2015

9  InvenSense Inc. Earnings Call, July 29, 2014, at 6.  Krock added that "we currently have backlog in

10 place representing a majority of this total current quarter revenue target" "of $86 million to $91

11 million."  *Id.* at 7.  Buttressing this statement, in the Company's financial results, Defendants

12 claimed that the value of InvenSense's inventory had actually increased by $4.5 million from the

13 prior quarter.  But for the approximately 20 million iPhone 5S and 5C chips being kept on the books

14 at full value in violation of Generally Accepted Accounting Principles ("GAAP"),[2] however,

15 InvenSense would not have been able to report an increase in the value of the Company's inventory.

16      16.    While expanding sales was obviously good news, investors and analysts focused on

17 whether InvenSense would be able to maintain its profit margins when it started shipping to the not-

18 so-secret new, high-volume customer.  With InvenSense's purported inventory of high-end, high-

19 margin 6-axis products, Defendants assured the market that, for 2Q15, "there's no one customer with

20 any particular window of pricing that is relevant" and even with the expanding sales to Apple, gross

21 margins would remain "unchanged" and "consistent with recent past quarters that is in the range

22 around 50%."  Following Defendants' July 29, 2014 statements, analysts were encouraged about

23

24 _____

[2]    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. The SEC has

25 the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").  SEC Regulation S-X (17

26 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and

27 disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be

28 duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. §210.10-01(a).

1   InvenSense's prospects.  As an analyst with Ascendiant Capital Markets commented on July 30,

2   2014, "[t]he only downside of adding a customer the size of Apple . . . is that these unit sizes

3   typically come with volume discounts that limit gross margin upside."  But, the analyst continued,

4   "now that we believe Apple is being incorporated into the firm's guidance for September and the

5   full-year, gross margins look to be stabilizing around the 50% mark."

6        17.   Less than one month after making the July 29, 2014 statements, Krock sold more than

7   96% of his InvenSense stock for proceeds of $3,173,650 and then promptly resigned from his

8   position as CFO.  As one analyst said at the time, "[t]his comes as a surprise to us given Mr. Krock's

9   commitment to the investment community and his knowledge of where the INVN business model

10  was heading . . . ."  Tiernan Ray, "InvenSense: New CEO Signals Broader Ambition, Say Needham,

11  Evercore," *Barron's*, August 26, 2014 (quoting Needham & Co.).

12       18.   Then, on September 19, 2014, Apple released the iPhone 6 and 6 Plus and it was

13  confirmed that those smartphones contained an InvenSense 6-axis MEMS chip.  Consistent with the

14  market's expectation that an InvenSense MEMS chip had finally been utilized by Apple, the

15  Company's stock price did not substantially react to the confirmation that the iPhone 6 and 6 Plus

16  included the Company's chip.  Within just three days of its release, Apple sold more than 10 million

17  iPhone 6 products and had manufactured and begun to distribute tens of millions of additional

18  iPhone 6 and 6 Plus units.

19       19.   Defendants stayed silent following the release of the iPhone 6 and 6 Plus until

20  October 28, 2014.  After the market closed that day, the truth about Defendants' misrepresentations

21  and omissions was revealed when, instead of announcing positive results due to finally adding Apple

22  as a customer, the Company shocked investors with disappointing financial results for the quarter

23  ended September 28, 2014 (2Q15).  Specifically, Defendants disclosed that InvenSense would have

24  to take a $7.4 million dollar charge "to write down earlier generation inventory that is now [in]

25  excess or obsolete" – largely the 20 million 3-axis MEMS chips that had been built for the iPhone 5S

26  and 5C – and due to increased sales to large-volume customers – namely, Apple – InvenSense's

27  average selling price ("ASP") for its products had dropped considerably.  Primarily as a result of

28  these two issues, gross margins declined from approximately 50% to only 37%.  Defendants further

1  acknowledged that the percentage of sales to 10% plus customers, of which there were only two

2  (Apple and Samsung), was largely unchanged – from 52% in 1Q15 to 55% in 2Q15 – so the margin

3  decline was due to the pricing arrangement, not unexpected volume, with InvenSense's new

4  customer, Apple.

5       20.    As set forth in the chart below, the October 28, 2014 disclosure of the truth about

6  InvenSense's inventory and pricing arrangement with Apple caused the Company's shares to

7  plummet more than 25% in one day.  From a closing price on October 28, 2014 of $21.48 per share,

8  InvenSense's stock price plunged $5.40 per share to $16.08 on October 29, 2014, all while the

9  overall market was actually going up.



21.    The bad news for InvenSense and its investors did not end on October 28, 2014.

Following the disclosure of the truth about the Company's inventory, Apple opted not to include an

InvenSense chip in its iWatch and went back to sourcing MEMS chips from STMicro.  InvenSense's

stock price has never recovered from the October 28, 2014 disclosures and, more than six months

after the end of the Class Period, continues to trade below $15.00 per share.

1    **III.    JURISDICTION AND VENUE**

2         22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

3    §1331 and §27 of the Exchange Act [15 U.S.C. §78aa] as the claims asserted herein arise under and

4    pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5

5    promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

6         23.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C.

7    §1391(b), as the Company maintains its headquarters in this District at 1745 Technology Drive,

8    Suite 200, San Jose, California 95110.

9         24.    In addition, many of the acts and conduct that constitute the violations of law

10   complained of herein, including dissemination to the public of materially false and misleading

11   information, occurred in and/or were issued from this District.  In connection with the acts alleged

12   herein, Defendants used the means and instrumentalities of interstate commerce, including, but not

13   limited to, the United States mails, interstate telephone communications, and the facilities of the

14   national securities exchanges and markets.

15   **IV.    THE PARTIES**

16       **A.  Lead Plaintiff**

17        25.    Lead Plaintiff the Vossen Group, as set forth in the certification filed previously on

18   March 9, 2015 (Dkt. No. 37), and as incorporated by reference herein, purchased 33,183 shares of

19   InvenSense stock during the Class Period and has been damaged thereby.  The Vossen Group is

20   comprised of class members Gregory Vossen, Albert Di Rienzo and Ed Farley.  Messrs. Vossen, Di

21   Rienzo and Farley are residents of Delano, Minnesota, El Paso, Texas and Rye, New Hampshire,

22   respectively.  As a result of the conduct alleged herein, the Vossen Group suffered damages and lost

23   over $288,669 from its purchases of InvenSense securities during the Class Period.

24       **B.  The Corporate Defendant**

25        26.    InvenSense designs, develops, manufactures and sells MEMS technologies for

26   motion tracking sensors, such as gyroscopes and accelerometers, in consumer electronics.  The

27   Company provides small sensors based on its multi-axis technology for consumer electronic devices,

28   including smartphones, tablets, wearable health and fitness accessories and video gaming devices.

1    As of March 30, 2014, InvenSense had 476 employees and a management team of only ten

2    executives, all of whom are headquartered in San Jose, California.

3        27.    At all relevant times, InvenSense common stock was listed and traded in an efficient

4    market under the symbol "INVN" on the New York Stock Exchange ("NYSE").  InvenSense,

5    through its management and agents, made, and is liable for the misstatements and omissions set forth

6    herein at ¶¶40, 42-45, 47.

7        **C.  The Individual Defendants**

8        28.    Behrooz Abdi joined InvenSense's Board of Directors in June 2011.  A little more

9    than one year later, on October 24, 2012, Abdi and the Board stripped Company founder Steve

10   Nasiri of his executive roles and Abdi took over as CEO and President.  When Abdi joined the

11   Company, he had approximately 22 years of experience in the semiconductor industry, including in

12   senior executive roles.  Throughout the Class Period, Abdi was the CEO and President of

13   InvenSense and had responsibility both for the Company's operations and reporting to the Board and

14   shareholders.  Indeed, it was reported in the November 14, 2013 *Forbes* article based on an interview

15   with Abdi that he "consults with [all] nine vice presidents before making most decisions."

16       29.    As part of his responsibilities as CEO and President, Abdi had responsibility for

17   assuring that InvenSense's public financial filings were accurate and complete.  For the quarter

18   ended June 29, 2014, and in conjunction with InvenSense's August 7, 2014 financial statements filed

19   with the SEC, Abdi signed a certification pursuant to §302 of the Sarbanes-Oxley Act, attesting that

20   he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of

21   a material fact or omit to state a material fact necessary to make the statements made, in light of the

22   circumstances under which such statements were made, not misleading."  To assure that the

23   certification was not simply a hollow gesture, Abdi further confirmed that he, along with then

24   InvenSense CFO Defendant Krock, (i) was responsible for establishing and maintaining

25   InvenSense's disclosure controls and procedures, (ii) had designed such controls to assure that

26   material information relating to InvenSense's business, including inventory, was promptly made

27   known to himself, Krock and the Company's small group of senior executives, and (iii) had routinely

28   evaluated the effectiveness of the Company's policies with regard to assuring that he and other

1    executives were made aware of material information.  At no time before, during or after the Class

2    Period did Abdi assert that he was not aware of material aspects regarding InvenSense's product

3    inventory or MEMS chip business with Apple.

4         30.    Abdi made or had authority over the content of, and how to communicate, the

5    misstatements and omissions set forth herein at ¶¶40, 42, 47, and is liable for those misstatements

6    and omissions.  Abdi is also liable as a control person of InvenSense within the meaning of §20(a) of

7    the 1934 Act for the misstatements and omissions set forth herein at ¶¶40, 42-45, 47.

8         31.    Alan Krock joined InvenSense in May 2011 and served as the Company's Vice

9    President and CFO until his abrupt resignation on September 2, 2014 "to pursue other

10   opportunities."  When Krock joined InvenSense, he had approximately 20 years of experience in

11   both the semiconductor and financial sectors, including significant experience in the areas of current

12   public financial requirements.  Throughout his tenure, Krock had responsibility for monitoring and

13   reporting InvenSense's financial results, budgets and financial expectations.  Krock also had

14   responsibility, with Abdi, for reporting to the Company's Board and shareholders.

15        32.    As part of his responsibilities as CFO, Krock had primary responsibility for assuring

16   that InvenSense's public financial filings were accurate and complete.  For the quarter ended June

17   29, 2015, and in conjunction InvenSense's August 7, 2014 financial statements filed with the SEC,

18   Krock signed a certification pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed

19   the contents of the filing to confirm the "report does not contain any untrue statement of a material

20   fact or omit to state a material fact necessary to make the statements made, in light of the

21   circumstances under which such statements were made, not misleading."  To assure that the

22   certification was not simply a hollow gesture, Krock further confirmed that he, along with Defendant

23   Abdi, (i) was responsible for establishing and maintaining InvenSense's disclosure controls and

24   procedures, (ii) had designed such controls to assure that material information relating to

25   InvenSense's business, including inventory, was promptly made known to himself, Abdi and the

26   Company's small group of senior executives, and (iii) had routinely evaluated the effectiveness of

27   the Company's policies with regard to assuring that he and other executives were made aware of

28   material information.  At no time before, during or after the Class Period did Krock assert that he

1   was not aware of material aspects regarding InvenSense's product inventory or MEMS chip business

2   with Apple.

3     33. Krock made or had authority over the content of, and how to communicate, the

4   misstatements and omissions set forth herein at ¶¶40, 43-45, 47, and is liable for those misstatements

5   and omissions.  Krock is also liable as a control person of InvenSense within the meaning of §20(a)

6   of the 1934 Act for the misstatements and omissions set forth herein at ¶¶40, 42-45, 47.

7     34. Abdi and Krock are collectively referred to herein as the "Individual Defendants."

8     35. Because of their positions with InvenSense, the Individual Defendants had access to

9   adverse undisclosed information about the Company's business, including the Company's inventory

10  and contracts with major customers such as Apple, via access to internal corporate documents

11  (including the Company's reports of actual operations), conversations and connections with other

12  corporate officers and directors, attendance at management and Board meetings and committees

13  thereof and via reports and other information provided to them in connection therewith.

14    36. The Individual Defendants, by virtue of their positions as CEO and CFO of

15  InvenSense, directly participated in the management of the Company, were directly involved in the

16  day-to-day operations of InvenSense at the highest levels and were privy to confidential information

17  concerning the Company and its business, operations, growth, financial statements and financial

18  condition, as alleged herein.  Abdi and Krock were directly involved in preparing and disseminating

19  the false and misleading statements and information alleged herein, were aware or recklessly

20  disregarded that the false and misleading statements were being issued regarding the Company, and

21  approved or ratified these statements, in violation of the federal securities laws.

22    37. As officers and controlling persons of a publicly-held company whose shares were,

23  and are, registered with the SEC pursuant to the Exchange Act, traded over the NYSE and governed

24  by the provisions of the federal securities laws, Abdi and Krock each had a duty to promptly

25  disseminate accurate and truthful information with respect to the Company's inventory and margins,

26  including the impact of InvenSense's contract with Apple to supply 6-axis MEMS chips for the

27  iPhone 6 and 6 Plus, and to correct any previously-issued statements that had become materially

28  misleading or untrue, so that the market price of the Company's publicly-traded shares would be

1  based upon truthful and accurate information.  Defendants' misrepresentations and omissions on July

2  29, 2014 and August 7, 2014 violated these specific requirements and obligations.

3       38.  The Individual Defendants, because of their positions of control and authority as

4  officers and/or directors of the Company, were able to and did control the content of InvenSense's

5  July 29, 2014 press release and conference call statements and August 7, 2014 SEC filing.  Abdi and

6  Krock were provided copies of the press release and SEC filing alleged herein to be misleading prior

7  to and shortly after their issuance and had the ability and opportunity to prevent their issuance or

8  cause them to be corrected.  Accordingly, Abdi and Krock are responsible for the accuracy of the

9  public reports and releases detailed herein, and are therefore primarily liable for the representations

10  contained therein.

11       39.  Each Defendant is liable as a participant in a fraudulent scheme and course of

12  business that operated as a fraud or deceit on purchasers of InvenSense common stock by

13  disseminating materially false and misleading statements and/or concealing material adverse facts.

14  The scheme: (i) deceived the investing public regarding InvenSense's business, operations and the

15  intrinsic value of InvenSense common stock; and (ii) caused Lead Plaintiff and other Class members

16  to purchase InvenSense common stock at artificially inflated prices.

17  **V.  DEFENDANTS' FALSE STATEMENTS AND MATERIAL OMISSIONS[3]**

18      **A.  Defendants' July 29, 2014 Misstatements and Omissions**

19       40.  After the market closed on July 29, 2014, Defendants issued a press release titled

20  "InvenSense Announces First Quarter Fiscal Year 2015 Results."  The press release quoted Abdi and

21  reported that InvenSense's inventories had increased $4.5 million, from $73 million to $77.5 million,

22  over the prior quarter and that the Company had gross profit of $31.17 million and a net loss of $4.8

23  million, or ($0.05) earnings per share ("EPS").

24

25

---

26  [3]  Pursuant to the Court's April 23, 2015 Order (Dkt. No. 59), a chart of Defendants' false and misleading statements is attached as Exhibit A.  The chart provides on a numbered, statement-by-statement basis: (1) the speaker(s), date(s), and medium; (2) the false and misleading statements; (3) the reasons why the statements were false and misleading when made; and (4) the facts giving rise to a strong inference of scienter.

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:15-cv-00084-JD          - 13 -

41.     Following issuance of the press release, InvenSense hosted a conference call on July 29, 2014, with analysts and investors to discuss the earnings announcement and the Company's operations.  Representing InvenSense on the call were defendants Abdi and Krock.  During the call, Defendants reiterated the financial results from the press release and emphasized the growth in InvenSense's business, as bolstered by a design win with a new major customer headquartered in the United States who would contribute "10% or greater . . . revenue" in the upcoming quarter.  This new customer, as the market knew, could only be Apple, which was launching its iPhone 6 and 6 Plus in September 2014.

42.     During his opening remarks, Abdi assured the market that because the Company had already built up 6-axis inventory for its existing customers' anticipated 2015 launches, it was now able "to meet significant new customer requirements," *i.e.* Apple, and that even with Apple as a customer, the Company "will keep . . . overall gross margins at consistent levels."  Abdi stated, in pertinent part, as follows:

> ***Having strategically built inventory ahead of anticipated demand for our second generations 6-axis products in previous quarters, we are now able to meet significant new customer requirements*** even while we continue to add manufacturing capacity and ramp into production our third-generation 6-axis products.
>
> While we expect gross margins at some of our top-tier customers to remain under pressure, as a result of high-volume pricing, as well as lower initial manufacturing yields as we ramp new products into production, ***we believe our higher value system solutions combined with our aggressive manufacturing cost reductions, will keep our overall gross margins at consistent levels***.

43.     During Krock's opening remarks on the call, he also referenced the "backlog" of high-quality inventory that InvenSense had ready to ship to customers as support for the Company's strong financial outlook for 2Q15, and repeatedly represented that margins will be "consistent" with recent historical levels notwithstanding the Company's new purchase order from Apple.  Krock stated, in pertinent part, as follows:

> Considering these factors, we expect FY15 Q2 revenue to be in the range of $86 million to $91 million.  ***To support this Q2 fiscal 2015 revenue outlook, we currently have backlog in place representing a majority of this total current quarter revenue target***.

*       *       *

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:15-cv-00084-JD

- 14 -

Product mix for the current quarter continues to favor our highest volume mobile customers.  And *we should generate a total gross margin in line with recent levels*.  We believe that on a GAAP basis our Q2 FY15 gross margin will be in a range around 48% continuing to now modestly reflect the impact of additional cost of amortization of intangibles acquired.

On a *non-GAAP basis, Q2 FY15 gross margin is expected to be consistent with recent past quarters that is in the range around 50%*.  In future quarters, lower-cost of products, additional production volumes, and improving product yields should contribute to a favorable impact on our gross margin.  *Therefore our target non-GAAP gross margin remains unchanged*.

\*        \*        \*

We expect our spending in margin opportunities for our FY15 – *we continue to expect gross margins generally consistent with our recent past and FY14 on a non-GAAP basis and on a GAAP basis in a range of around approximately 48%*.

44.    Later during the call, in response to an analyst's request for additional information regarding the number of units sold and ASPs as a whole, Krock confirmed that ASPs, manufacturing costs and, thus, gross margins, will be "very consistent" with prior quarters as set forth, in pertinent part, as follows:

There's no significant difference in trends quarter on quarter.  I know many investors do look at the SEC filings and so forth, which include information on that.

*Generally percentage of 6-axis average selling price of 6-axis product, steps we take to manufacture, or manage manufacturing cost and so forth generally very consistent trends with recent past.  Therefore, generating a very consistent gross margin level with the last couple quarters as well.*

45.    In addition, in response to an analyst's probing regarding potential pricing declines for new product launches (*i.e.*, MEMS chips for the iPhone 6 and 6 Plus), Krock insisted that "generally it's about the value of these sensor function in the market with the Gyro and integrated sensor attached.  *So there's no one customer with any particular window of pricing that's relevant*" to the Company's margins.

46.    Analysts were very encouraged about InvenSense's prospects after the conference call, recognized that Apple was the new United States-based customer and interpreted the Company's positive guidance, including statements about margins, as incorporating the pricing and volume at which the Company had agreed to supply 6-axis MEMS chips for Apple's iPhone 6 products.  For example, a research report from Ascendiant Capital Markets, LLC dated July 30, 2014, stated, in pertinent part, as follows:

As expected INVN delivered a strong June quarter and provided further evidence that supports our belief of the initial participation in Apple's (AAPL, N/R) portfolio, likely in both the iPhone6 and wearables.

\*        \*        \*

The only downside of adding a customer the size of Apple, and possibly Xiaomi, is that these unit sizes typically come with volume discounts that limit gross margin upside.  However, now that we believe Apple is being incorporated into the firm's guidance for September and the full-year, gross margins look to be stabilizing around the 50% mark, and we believe should set a new base for the company to improve on through growing yields and cost reductions.

**B. Defendants' August 7, 2014 Misstatements and Omissions**

47.     On August 7, 2014, InvenSense filed with the SEC its 1Q15 Form 10-Q, signed and certified by Abdi and Krock.  The 1Q15 Form 10-Q reiterated the financial results reported by the Company on July 29, 2014, including the previously reported inventory valuation, gross profits and EPS.  In addition, the 1Q15 Form 10-Q incorporated the Risk Factors included in the FY14 Form 10-K filed on May 29, 2014 without any additions or revisions to inform investors of risks associated with the new, high-volume customer (Apple), including the significant pricing discount given to secure the new customer.  Such risks would and did have a material adverse effect on the Company's gross margins.

**C. Defendants' Class Period Statements Were False and Misleading**

48.     Defendants' statements on July 29, 2014 and August 7, 2014 regarding InvenSense's inventory, gross profit and earnings, identified in ¶¶40, 42-43, 47, were materially false and misleading because Defendants failed to disclose that the Company's financial results were overstated and that approximately 10% of the Company's reported inventory was comprised of 20 million 3-axis MEMS chips that had been manufactured for use in the iPhone 5S and 5C in the summer of 2013, but never sold to Apple.  As set forth in ¶¶56-65, and in accordance with GAAP, by no later than the end of 1Q15, Defendants were required to take a $6.90 million charge against the cost of revenue to write down InvenSense's inventory balances to reflect the diminished value of this obsolete inventory.  As a result of Defendants' failure to timely write down the iPhone 5S and 5C inventory, InvenSense's reported gross profit was overstated by $6.90 million, a 28% overstatement, and EPS was overstated by $0.08 per share, a 62% overstatement.  But for

1   Defendants' failure to timely write down the iPhone 5S and 5C inventory, InvenSense also would

2   have had to report that its inventory valuation had actually shrunk, and was not "strategically built

3   . . . ahead of anticipated demand," between 4Q14 and 1Q15.

4           49.     Defendants' statements on July 29, 2014 and August 7, 2014 regarding InvenSense's

5   new customer (Apple) and margins for 2Q15, identified in ¶¶42-45, 47, were materially false and

6   misleading because, in addition to the overstated inventory, Defendants failed to disclose that they

7   had agreed to commit the majority of InvenSense's manufacturing capacity and deliver no fewer

8   than 35 million new, 6-axis MEMS chips to Apple in 2Q15 for use in the iPhone 6 and 6 Plus at a

9   price significantly below what InvenSense had negotiated, on average, with other customers.  Given

10  the terms of the Apple purchase order, under which InvenSense was committed to delivering at least

11  35 million 6-axis MEMS chips during 2Q15 for approximately 40% margin, and the undisclosed

12  inventory of iPhone 5S and 5C chips, there was no basis for Defendants' claims that InvenSense

13  "will keep [its] overall gross margins at consistent levels" and that gross margins would "be

14  consistent with recent past quarters that is in the range around 50%" and "remain[] unchanged."

15          50.     As a result of Defendants' failure to disclose the true, material facts regarding

16  InvenSense's inventory and margins, the Company's stock price traded at artificially inflated prices

17  above $20 per share during the Class Period.

18  **VI.     THE TRUTH ABOUT INVENSENSE'S INVENTORY AND MARGINS IS
            DISCLOSED**

19

20          51.     Following the close of the market on October 28, 2014, InvenSense issued a press

21  release announcing 2Q15 financial results.  While the press release reported revenues in line with

22  guidance for InvenSense, investors were stunned to learn that the Company's gross margins had

23  plummeted to 37%, substantially lower than the 50% gross margin Defendants had reported on July

24  29, 2014, which they assured the market would remain "consistent" through 2Q15.  The press

25  release explained that "[t]he sequential decrease in gross margin was primarily attributable to two

26  factors: a non-recurring inventory charge largely related to earlier generations of the company's

27  products that reduced the gross margin by approximately eight percentage points, and a shift in

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:15-cv-00084-JD                                                                                        - 17 -

1    revenue mix towards lower margin, high volume customers that reduced the gross margin by

2    approximately five percentage points."

3        52.    Later that evening, the Company held a conference call for analysts and provided

4    additional information about the Company's poor performance.  During his opening remarks on the

5    call, Defendant Krock's replacement as CFO, Mark Dentinger, addressed the Company's

6    disappointing margins and again identified the two primary drivers of the 30% drop in gross margin

7    as (1) a $7.4 million write down of excess or obsolete "earlier generation inventory" and (2) a

8    change in customer mix to more of the Company's "largest customers" – namely Apple – who had

9    "lower average selling prices."[4]  With regard to the second driver, Dentinger admitted that the drop

10   in gross margin was not caused by an unexpected increase in the volume of chips sold to large

11   customers as "[r]evenue from customers who individually made up more than 10% of total revenue

12   in Q2 was 55% [and] 10%-plus customers in Q1 made up 52% of our total revenue."

13       53.    During the conference call, analysts focused on the substantial drop in gross margins.

14   In response to their questions, Defendant Abdi claimed that "if you look at our business mix, the top

15   two customers [*i.e.*, Apple and Samsung] are more dominant this past quarter and the current quarter

16   than we anticipated when we started. . . .  So it is really the mix, as Mark mentioned, is more than

17   anticipated towards the tier ones."  Contrary to Defendants' July 29, 2014 statement that "there's no

18   one customer with any particular window of pricing that's relevant" to margins, Abdi now admitted

19   that reduced pricing had been "given to some of the customers [Apple] to get the revenue and the

20   market [share] and to really get that going."  Indeed, during the conference call analysts honed in on

21   the "customer mix" remark and questioned how that mix could have had such a negative impact on

22   margins when the revenue contribution from the Company's 10% customers had only moved from

23   52% in 1Q15 to 55% in 2Q15.  In response, Dettinger conceded that "[i]t is true that our contribution

24   from 10% customers moved from 52% to 55% during the quarter," and acknowledged that it was the

25   prices paid by those customers that drove the margin down: "So we only had two [10%] customers

26

27   ────────────────
     [4]    A third factor, InvenSense's "yielded manufacturing costs, especially for . . . newer products,

28   [was] higher than . . . expected" and was reported to have lowered the 2Q15 gross margin by 2%.

1  contributing in Q2 [Apple and Samsung], so there was a pretty substantial move inside the 10%

2  customers upstream to the lower margin arena."

3       54.    Investors were stunned by the disclosure of the truth about InvenSense's inventory

4  and margins.  In response to the October 28, 2014 disclosures, the price of InvenSense common

5  stock plummeted over 25% from $21.48 per share prior to the disclosures to a closing price on the

6  next day, October 29, 2014, of $16.08 per share.  InvenSense's trading volume on October 29, 2014

7  alone exceeded 16 million shares, more than five times the Company's average daily trading

8  volume.

9       55.    In the seven months since the October 28, 2014 disclosures, InvenSense's stock price

10  has never even approached its Class Period levels and currently trades for under $15.00 per share.

11  **VII.    INVENSENSE'S FALSE FINANCIAL STATEMENTS VIOLATED GAAP**

12       56.    In order to artificially meet Wall Street analysts' financial targets and convince Apple

13  and the market that InvenSense had the capacity to meet its MEMS chip demands for the iPhone 6

14  and 6 Plus while still meeting its other customers' demands, Defendants improperly accounted for

15  inventory, materially and falsely reported inflated gross profit and inventory and understated cost of

16  revenue, net losses and losses per share for 1Q15 in violation of GAAP.

17       57.    InvenSense's 1Q15 financial statements were false and misleading because the

18  Company had improperly failed to write-off at least $6.90 million of product inventory that

19  Defendants knew or were reckless in not knowing was excess, obsolete or unsalable by no later than

20  June 29, 2014.

21       58.    As alleged above, by the end of the fiscal quarter ended September 29, 2013 (3Q14),

22  InvenSense had fabricated and stockpiled approximately 20 million 3-axis MEMS chips at an

23  approximate cost of $0.44 per chip in a failed attempt to obtain a design win with Apple for the

24  iPhone 5S and 5C.  However, Apple was not obligated to, and ultimately did not, buy or pay for the

25  3-axis MEMS chips InvenSense had designed and ramped up in support of Apple's September 20,

26  2013 launch of the iPhone 5S and 5C.

27       59.    Accordingly, by no later than the end of 3Q14, InvenSense was stuck with

28  approximately $8.8 million of inventory (20 million chips x $0.44 approximate cost) that had been

1    designed and built for Apple and would quickly become obsolete or unsalable in the wake of the

2    Company's iPhone 5S and 5C design loss.  Defendants Abdi and Krock knew this to be true because

3    in their positions as CEO and CFO of InvenSense, they knew that the Company's high-volume

4    customers for these types of MEMS chips were continually demanding enhanced, newly designed

5    and/or increasingly higher-performing versions of the chips with nearly every new or refreshed

6    smartphone or tablet model.  Indeed, the Company itself remarked in its Form 10-K for the period

7    ending March 30, 2014 that the environment in which it operated was characterized by rapidly

8    changing technologies, technological obsolescence, price erosion, rapid shifts in customer's product

9    architecture and short product life.  Compounding matters were those 3-axis MEMS chips in the

10   Company's inventory which suffered from manufacturing yield problems and did not meet any high-

11   volume customer's specifications, much less Apple's.

12          60.     The only real potential sales outlet for the leftover Apple 3-axis MEMS chip

13   inventory was a secondary market consisting mainly of a few Chinese-based white box handset or

14   toy manufacturers.  Those potential customers, however, only ordered chips in quantities a fraction

15   of the size of InvenSense's inventory of approximately 20 million units.  For example, in 3Q14, the

16   Company was projected to only sell 4.4 million units across its entire product line to white box

17   vendors.  Moreover, the Chinese handset and toy manufacturers did not need the full capabilities

18   offered by InvenSense's 3-axis chips and, accordingly, were not willing to pay as much as Apple or

19   other large manufacturers for the products.  Further, in the case of defective 3-axis MEMS chips, the

20   Company would have had to focus engineering resources on making after-the-fact modifications to

21   the chips before they could be sold to the Chinese manufacturers, and, as of mid-2013, it was not

22   doing so in order to focus on its high-volume customers.  Despite these facts, prior to the Class

23   Period, InvenSense failed to write off any of the leftover 3-axis MEMS chip inventory that had been

24   designed and ramped up for the iPhone 5S and 5C in 2013.

25          61.     Pursuant to GAAP, inventory must be valued at the lower of the cost to acquire or

26   build the inventory, or its market value.  This is a fundamental accounting rule known more simply

27   as the "lower of cost or market" rule.  If the value of inventory carried at cost is diminished by

28   obsolescence, lower price levels, excess quantities or other circumstances, a loss must be recognized

by a charge against income in the accounting period in which the loss occurs, to write-down the inventory to its lower market value.  Specifically, FASB Accounting Standards Codification ("ASC") 330-10-35-1, Inventory, states:

**Adjustments to Lower of Cost or Market**

35-1  A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as their cost.  Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period.  This is generally accomplished by stating such goods at a lower level commonly designated as market.

62.     Therefore, according to GAAP, InvenSense was required to write down the excess and obsolete 3-axis MEMS chip inventory it had ramped up to support Apple in 2013.  But the Company failed to do, despite telling investors that it regularly reviewed inventory valuations.  In its "Summary of Significant Accounting Polices" note to its year end March 30, 2014 consolidated financial statements, InvenSense claimed that it had reviewed its inventory values and quantities for obsolescence, and taken charges for excess or obsolete inventory as necessary in order to state inventories at the lower of cost or market value as required by GAAP:

**Inventories**

Inventories are stated at the lower of cost or market on a first-in, first-out basis.  Inventories include finished good parts that may be specialized in nature and subject to obsolescence.  The Company periodically reviews the quantities and carrying values of inventories to assess whether the inventories are recoverable.  The costs associated with write-downs of inventory for excess quantity and technological obsolescence are charged to cost of revenue as incurred.

63.     In its 1Q15 Form 10-Q filed on August 7, 2014, InvenSense falsely represented that its statement in its year-end public financial statements – that it had reviewed its inventory for obsolescence and accounted for it accordingly – was still true, and confirmed that no material changes had been made to these accounting policies since that date.  The Company stated, in pertinent part, as follows:

These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and the notes thereto for the fiscal year ended March 30, 2014 included in the Company's Annual Report on Form 10-K filed on May 29, 2014 with the Securities and Exchange Commission ("SEC").  No material changes have been made to the Company's significant accounting

1    policies since the Company's Annual Report on Form 10-K for the fiscal year ended
2    March 30, 2014.

                                    *       *       *

3
4    ***The consolidated financial statements have been prepared in conformity
     with U.S. generally accepted accounting principles, or GAAP . . . .***

5        64.    These statements were false when made.  Contrary to the inventory accounting policy

6    statements made in the footnotes to its public financial statements, Defendants knew or were reckless

7    in not knowing that at least $6.90 million of its leftover Apple iPhone 5S/5C 3-axis MEMS chip

8    inventory ((approximately 20 million units built minus maximum of 4.4 million units sold) x $0.44

9    per chip) was excess, obsolete or unsalable as of June 29, 2014.  Despite this knowledge, Defendants

10   failed to take the necessary $6.90 million charge against cost of revenues to write down inventory

11   balances to reflect the diminished value of its obsolete and excess inventory as required by GAAP.

12   Accordingly, the Company's gross profit margin was also overstated.   The impact of this

13   misstatement on the Company's publicly disseminated financial statements was material, and is

14   summarized as follows:

| Summary of InvenSense Key Public Financial Statement Misstatements (In millions, except earnings (loss) per share) | | | | |
|---|---|---|---|---|
| | **Three Months Ended 6/29/2014** | | | |
| | **Cost of Revenue** | **Gross Profit** | **Net Income (Loss)** | **Earnings (Loss) Per Share** |
| As reported in 6/29/14 10-Q | $35.50 | $31.20 | ($4.80) | ($0.05) |
| Actual (after inventory correction) | $42.40 | $24.30 | ($11.70) | ($0.13) |
| **Amount under/overstated** | **$6.90** | **$6.90** | **$6.90** | **$0.08** |
| **Percentage under/overstated** | **16%** | **28%** | **59%** | **62%** |

23       65.    As a result of Defendants' failure to timely write off excess, obsolete and unsalable

24   inventory, InvenSense's financial statements filed on its 1Q15 Form 10-Q were materially false and

25   misleading and violated GAAP, as the Company's reported gross profit was inflated by at least $6.90

26   million and EPS was overstated by at least $0.08.  On a percentage basis, these misstatements were

1    also material, inflating the Company's reported gross profit by 28% and overstating its net income

2    and EPS by 59% and 62%, respectively.

3    **VIII.    ADDITIONAL SCIENTER ALLEGATIONS**

4         66.     Defendants acted with scienter in that Abdi and Krock both made specific statements

5    regarding InvenSense's inventory and gross margins, as set forth in ¶¶40, 42-45, 47, and thus knew,

6    or were reckless in not knowing, the true facts regarding the Company's inventory and gross

7    margins, particularly because they related to Apple – one of only two 10% customers who

8    contributed to InvenSense's revenue in 2Q15.  The Company had been trying to obtain a design win

9    with Apple since at least 2010, and, under Abdi, had even started volume production of 3-axis

10   MEMS chips for Apple's iPhone 5S and 5C in 2013.  Given the importance of obtaining Apple as a

11   customer and Defendants' constant discussion of the Company's design wins with customers, Abdi

12   and Krock knew or were reckless in not knowing about the approximately 20 million 3-axis MEMS

13   chips leftover from the design loss for the iPhone 5S and 5C in 2013, and that the June 2014

14   purchase order with Apple required the delivery of at least 35 million 6-axis MEMS chips for the

15   iPhone 6 and 6 Plus in 2Q15 and included pricing terms that only yielded margins of approximately

16   40%.  Abdi and Krock further knew, or were reckless in not knowing, that the pricing and volume

17   terms for the design win with Apple, given the volume of chips Apple required, would materially

18   affect the Company's margins and profits.  The market certainly knew, and closely followed the

19   Company's disclosures regarding design wins.  As Krock recognized during the July 29, 2014 call,

20   design win details, such as "units and ASP as a whole," were included in SEC filings which

21   investors "do look at."  And regarding inventory, Abdi declared during the October 28, 2014 call that

22   they watch inventory issues "very carefully" and "pretty closely."

23        67.     Accordingly, Abdi and Krock knew that their statements in the July 29, 2014 press

24   release and conference call and August 7, 2014 Form 10-Q relating to the Company's inventory and

25   gross margins were materially false and misleading; knew that such statements and documents

26   would be disseminated to the investing public; and knowingly and substantially participated in the

27   issuance and dissemination of such statements and documents as primary violations of the federal

28   securities laws.  Abdi and Krock participated in the fraudulent scheme alleged herein by virtue of

their receipt of information reflecting the true facts regarding InvenSense's excess and obsolete 3-axis inventory from the 2013 Apple design loss and purchase order with Apple for at least 35 million 6-axis MEMS chips at prices substantially lower than those for its other customers, their control over, receipt and/or review of the 2Q15 press release and Form 10-Q before and after they were issued, and their associations with the Company which made them privy to confidential information concerning InvenSense's inventory and gross margins, as set forth in ¶¶28-39.

68.     Krock was further motivated to engage in this fraudulent course of conduct in order to dump over 96% of his personally-held InvenSense common stock at inflated prices.  As set forth below, Krock sold over 126,000 shares during the three month Class Period for insider trading proceeds of over $3 million:

| Date | Shares | Price | Proceeds |
|------|-------:|-------|---------:|
| 18-Aug-2014 | 1,666 | $24.70 | $41,150 |
| 27-Aug-2014 | 69,650 | $25.03 | $1,743,340 |
| 27-Aug-2014 | 25,000 | $24.88 | $622,000 |
| 27-Aug-2014 | 5,350 | $25.03 | $133,911 |
| 28-Aug-2014 | 25,000 | $25.33 | $633,250 |
| | **126,666** | | **$3,173,650** |

69.     Krock's sales during the Class Period were at unusual times and amounts.  Krock sold only 25,000 of his InvenSense shares during the same quarter the prior year (2Q13) and only 25,000 shares in the quarter proceeding to the Class Period (1Q15).  Based on his SEC Form 4 filings, as of August 28, 2014, when InvenSense's stock was trading at over $25 per share, Krock had sold 96% of the shares he held at the beginning of the Class Period.  Defendants' scheme enabled Krock to sell more than 96% of his InvenSense stock for proceeds of $3,173,650 less than a month after making false and misleading statements on July 29, 2014, and then to quickly resign from his position as CFO before the market learned the truth.

## IX.     LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS

70.     During the Class Period, as detailed herein, Defendants engaged in a scheme and wrongful course of business that was designed to and did artificially inflate InvenSense's stock price, whose misconduct operated as a fraud and deceit on Class Period purchasers of the Company's common stock.  Defendants did this by making materially false and misleading statements and

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:15-cv-00084-JD                                                                                                                                - 24 -

1  omissions regarding InvenSense's inventory and margins as set forth in ¶¶40, 42-45, 47.  When the

2  false and misleading nature of Defendants' statements was revealed after the market closed on

3  October 28, 2014, InvenSense's stock price dropped precipitously from $21.48 per share to $16.08

4  per share by the close of trading on October 29, 2014 as the artificial inflation dissipated.  As a result

5  of their purchases of InvenSense common stock during the Class Period at artificially inflated prices,

6  Lead Plaintiff and other Class members suffered significant damages.

7        71.    The market for InvenSense common stock was open, well-developed and efficient at

8  all relevant times, with average daily trading volume of more than 3,148,553 shares during the Class

9  Period.  As a result of Defendants' misstatements and material omissions, as alleged herein,

10  InvenSense's common stock traded at artificially inflated prices.  Lead Plaintiff and other Class

11  members purchased or otherwise acquired InvenSense common stock relying upon the integrity of

12  the market relating to InvenSense common stock and suffered economic losses as a result thereof.

13        72.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members

14  was a direct result of Defendants' misrepresentations artificially inflating InvenSense's stock price

15  and the subsequent significant decline in the value of InvenSense common stock when the truth was

16  revealed after the market closed on October 28, 2014.

17        73.    On that day, it was disclosed that InvenSense's gross margins for 2Q15 were only

18  37% as a result of the $7.4 million charge the Company had to take for the excess and obsolete 3-

19  axis inventory from the 2013 Apple design loss and as a result of the pricing discounts the Company

20  had to give to Apple.  As a direct result of the October 28, 2014 disclosure of the truth about

21  InvenSense's inventory and margin, and as illustrated in the chart below, the price of the Company's

22  common stock suffered a significant decline.  By the close of the market on the next day, October

23  29, 2014, InvenSense's common stock price had dropped more than 25%, a loss of $5.40 per share.

24

25

26

27

28



74.     The decline in InvenSense's common stock price on October 29, 2014 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the market closed on October 28, 2014.  The timing and magnitude of InvenSense's stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct.  Indeed, as illustrated in the chart above, on the same day that InvenSense's common stock share price closed down over 25%, the Standard & Poor's 500 Index and Dow Jones Industrial Index each decreased less than a percentage point.  Moreover, there was no news about InvenSense, other than the disclosures in the October 28, 2014 press release or conference call, that could explain the Company's stock price decline.

75.     The economic loss Lead Plaintiff and other Class members suffered was a direct result of Defendants' fraudulent scheme to artificially inflate InvenSense's stock price and maintain that price at artificially inflated levels, as was revealed by the subsequent and significant decline in the value of InvenSense's stock when the truth about Defendants' earlier misrepresentations and omissions became publicly available.

## X.     CLASS ACTION ALLEGATIONS

76.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased InvenSense common stock during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

77.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  At all relevant times, InvenSense's common stock was actively traded on the NYSE.  Record owners and other Class members may be identified from records maintained by InvenSense or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to Lead Plaintiff, InvenSense reported that more than 88 million shares of its common stock were outstanding as of May 7, 2014.  Accordingly, Lead Plaintiff reasonably believes there are hundreds, if not thousands, of members in the proposed Class.

78.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Lead Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

80.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

1        (a)     Whether the federal securities laws were violated by Defendants' acts as

2   alleged herein;

3        (b)     Whether statements made by Defendants to the investing public

4   misrepresented or omitted material facts about the business, operations and financial conditions of

5   InvenSense;

6        (c)     Whether the price of InvenSense common stock was artificially inflated

7   during the Class Period; and

8        (d)     To what extent the Class members have sustained damages and the proper

9   measure of damages.

10        81.     A class action is superior to all other available methods for the fair and efficient

11   adjudication of this controversy as joinder of all members is impracticable.  Furthermore, as the

12   damages suffered by individual Class members may be relatively small, the expense and burden of

13   individual litigation make it impossible for members of the Class to individually redress the wrongs

14   done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I
#### For Violation of §10(b) of the 1934 Act and Rule 10b-5
#### Against All Defendants

17        82.     Lead Plaintiff repeats and realleges each and every allegation above as if fully set

18   forth herein.

19        83.     Defendants are liable for making false statements and failing to disclose adverse facts

20   known to them about InvenSense.  Defendants' fraudulent scheme and course of business that

21   operated as a fraud or deceit on purchasers of InvenSense common stock was a success, as it: (i)

22   deceived the investing public regarding InvenSense's business and financial condition; (ii)

23   artificially inflated the price of InvenSense common stock; and (iii) caused Lead Plaintiff and other

24   Class members to purchase InvenSense common stock at inflated prices.

25        84.     During the Class Period, Defendants participated in the preparation of and/or caused

26   to be disseminated the false or misleading statements specified above, which they knew or recklessly

27   disregarded were materially false or misleading in that they contained material misrepresentations

28

1   and failed to disclose material facts necessary to make the statements made, in light of the

2   circumstances under which they were made, not misleading.

3           85.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

4             (a)    Employed devices, schemes, and artifices to defraud;

5             (b)    Made untrue statements of material facts or omitted to state material facts

6   necessary to make the statements made, in light of the circumstances under which they were made,

7   not misleading; or

8             (c)    Engaged in acts, practices, and a course of business that operated as a fraud or

9   deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of

10   InvenSense common stock during the Class Period.

11           86.    Defendants, individually and together, directly and indirectly, by the use, means or

12   instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous

13   course of conduct to conceal the truth and/or adverse material information about InvenSense's

14   business, operations and financial condition as specified herein.

15           87.    Defendants employed devices, schemes and artifices to defraud, while in possession

16   of material, adverse, nonpublic information and engaged in acts, practices, and a course of conduct

17   as alleged herein by, among other things, participating in the making of untrue statements of material

18   fact and omitting to state material facts necessary to make the statements made about the Company

19   and its business operations and financial status, in the light of the circumstances under which they

20   were made, not misleading, as set forth more particularly herein.  Defendants further engaged in

21   transactions, practices and a course of business which operated as a fraud and deceit upon the

22   purchasers of InvenSense common stock during the Class Period.

23           88.    Defendants had actual knowledge of the misrepresentations and omissions of material

24   fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants'

25   misconduct was engaged in knowing, or with reckless disregard for, the truth, and for the purpose

26   and effect of concealing InvenSense's operating condition and financial status from the investing

27   public and supporting the artificially inflated price of its common stock.

28

1    89.    As a result of the dissemination of materially false or misleading information and

2  failure to disclose material facts, as set forth in ¶¶40-50, 56-65, the market price of InvenSense

3  common stock was artificially inflated during the Class Period.  In ignorance of the fact that the

4  market prices of the Company's stock were artificially inflated, and relying directly or indirectly on

5  the false and misleading statements, or upon the integrity of the market in which the Company's

6  stock traded, and/or on the absence of material adverse information that was known to or recklessly

7  disregarded by Defendants, but not disclosed in Defendants' public statements during the Class

8  Period, Lead Plaintiff and the other Class members acquired InvenSense's common stock during the

9  Class Period at artificially inflated prices and were ultimately damaged thereby.

10    90.    At the time of said misrepresentations and omissions, Lead Plaintiff and the other

11  Class members were ignorant of their falsity, and believed them to be true and complete.  Had Lead

12  Plaintiff, the other Class members and the marketplace known the truth regarding InvenSense's

13  inventory and margins, which Defendants did not disclose, Lead Plaintiff and the other Class

14  members would not have purchased or otherwise acquired InvenSense's stock, or, if they had

15  acquired its stock during the Class Period, would not have done so at the artificially inflated prices

16  which they paid.

17    91.    By reason of the foregoing, Defendants have violated §10(b) of the 1934 Act and

18  Rule 10b-5.

19    92.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and

20  the other Class members suffered damages in connection with their Class Period purchases of

21  InvenSense common stock.

22                                **COUNT II**
                      **For Violation of §20(a) of the 1934 Act**
23                           **Against All Defendants**

24    93.    Lead Plaintiff repeats and realleges each and every allegation above as if fully set

25  forth herein.

26    94.    Defendants Abdi and Krock acted as controlling persons of InvenSense within the

27  meaning of §20 of the 1934 Act.  InvenSense controlled all of its employees and each of the

28  Individual Defendants.  By virtue of their high-level positions, and their ownership and contractual

rights, participation in and awareness of InvenSense's finances and operations, including the Company's inventory of MEMS chips and business relationship with Apple, as well as their intimate knowledge of the statements made to the investing public on July 29, 2014 and August 7, 2014, Abdi and Krock had the power to influence and control, and did influence and control, directly or indirectly, the Company's decision making, including the content and dissemination of the statements Lead Plaintiff contends are false and misleading.   Defendants Abdi and Krock participated in the July 29, 2014 conference call with investors and analysts and were provided with, or had unlimited access to, copies of the Company's July 29, 2014 press release and August 7, 2014 10-Q, alleged by Lead Plaintiff to be false and misleading, prior to and/or shortly after they were issued, and had the ability to prevent their issuance or cause them to be corrected.

95.     In particular, each of these Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, in particular, the design, manufacturing and sale (or lack thereof) of MEMS chips to Apple, and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

96.     As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases of InvenSense's publicly traded common stock during the Class Period.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Declaring that Defendants are liable pursuant to the 1934 Act;

B.     Determining and certifying that this action is a proper class action and certifying Lead Plaintiff as a class representative and its counsel as Lead Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

1       C.     Awarding compensatory damages in favor of Lead Plaintiff and the Class against

2  Defendants, jointly and severally, for damages sustained as a result of Defendants' wrongdoing, in

3  an amount to be proven at trial;

4       D.     Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as

5  well as reasonable attorneys' fees, costs and expenses incurred in this action; and

6       E.     Awarding such other relief as the Court may deem just and proper.

7  **XII.    JURY DEMAND**

8       Lead Plaintiff demands a trial by jury.

9  DATED: May 26, 2015              ROBBINS GELLER RUDMAN

10                                 & DOWD LLP
TOR GRONBORG

11                                 IVY T. NGO

12

13                                             _s/ Tor Gronborg_
                                           TOR GRONBORG

14

15                                655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

16                                619/231-7423 (fax)

17                                ROBBINS GELLER RUDMAN
                                & DOWD LLP

18                                SHAWN A. WILLIAMS
Post Montgomery Center

19                                One Montgomery Street, Suite 1800
San Francisco, CA 94104

20                                Telephone: 415/288-4545
415/288-4534 (fax)

21                                ROBBINS GELLER RUDMAN
                                & DOWD LLP

22                                EVAN J. KAUFMAN
58 South Service Road, Suite 200

23                                Melville, NY 11747
Telephone: 631/367-7100

24                                631/367-1173 (fax)

25                                Lead Counsel for Plaintiff

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:15-cv-00084-JD                                                            - 32

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 26, 2015.

s/ Tor Gronborg
TOR GRONBORG

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail: torg@rgrdlaw.com

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:15-cv-00084-JD

CAND-ECF-

# Mailing Information for a Case 3:15-cv-00084-JD In re InvenSense, Inc. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David E. Azar**
  dazar@milberg.com,pwedgworth@milberg.com,maoffice@milberg.com,cchaffins@milberg.com,jconte@milberg.com,dgjonaj@milberg.com

- **Peter E. Borkon**
  peterb@hbsslaw.com

- **David Malcolm Furbush**
  david.furbush@pillsburylaw.com,maria.nguyen@pillsburylaw.com,cate@pillsburylaw.com

- **Francis M. Gregorek**
  gregorek@whafh.com

- **Tor Gronborg**
  torg@rgrdlaw.com

- **Nathan R. Hamler**
  nathanh@johnsonandweaver.com,paralegal@johnsonandweaver.com,michaelf@johnsonandweaver.com

- **Marisa C. Livesay**
  livesay@whafh.com,boyles@whafh.com

- **Betsy Carol Manifold**
  manifold@whafh.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Ivy T Ngo**
  ingo@rgrdlaw.com,khuang@rgrdlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Mark Punzalan**
  markp@punzalanlaw.com,nporritt@zlk.com,office@punzalanlaw.com,aapton@zlk.com

- **Rachele R. Rickert**
  rickert@whafh.com,cabrera@whafh.com,boyles@whafh.com,cothran@whafh.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,erinj@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)