UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE INVENSENSE, INC. SECURITIES LITIGATION. | Case No. 15-cv-00084-JD<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 64 |

This is a securities fraud class action brought by lead plaintiff the Vossen Group on behalf of all persons or entities who purchased the publicly-traded common stock of InvenSense, Inc. ("InvenSense" or "Company") between July 29, 2014 and October 28, 2014. Dkt. No. 62 ¶¶ 1, 25.[1] The Vossen Group alleges in the operative consolidated complaint that defendants InvenSense, its CEO and President, Behrooz Abdi ("Abdi"), and its former CFO and Vice President, Alan Krock ("Krock") made false and misleading public statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. *See id*. ¶¶ 1, 28, 31. Defendants move to dismiss the complaint for failure to state a claim under the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Dkt. No. 64. The Court grants the motion.

## BACKGROUND

As alleged in the complaint, InvenSense is a technology company which "was a pioneer in the advancement of motion processing solutions and micro-electro-mechanical system ('MEMS')

---

[1] The Vossen Group is made up of putative class members Gregory Vossen, Albert Di Rienzo and Ed Farley, who collectively "purchased 33,183 shares of InvenSense during the Class Period." Dkt. No. 62 ¶ 25.

technology." Dkt. No. 62 ¶ 2. "The Company's MEMS chips are used to track complex user motions through motion sensors, including microscopic gyroscopes and accelerometers," based on patented technology. *Id*.

Plaintiff alleges that the market for MEMS chips "began to explode" after Apple Inc. ("Apple") introduced the original iPhone in June 2007, and that ever since, it has been an important goal for InvenSense to obtain Apple as a customer. *Id*. ¶¶ 4, 66. After some difficulties and losses (particularly to its rival, STMicroelectronics N.V. ("STMicro")), InvenSense finally accomplished that goal when Apple selected InvenSense's 6-axis MEMS chip in June 2014 for use in the iPhone 6 and 6 Plus. *Id*. ¶¶ 3-13.

Despite that success, plaintiff alleges that defendants made actionable false statements and material omissions in two ways in connection with the June 2014 Apple design win (and InvenSense's failed efforts for previous generations of iPhones that preceded that win). The first has to do with inventory. On October 28, 2014, InvenSense announced that it needed to write down $7.4 million for "excess or obsolete 'earlier generation inventory.'" *Id*. ¶ 52. Plaintiff alleges that the "earlier generation inventory" referred to in this statement was "largely the 20 million 3-axis MEMS chips that had been built for the iPhone 5S and 5C" which Apple ultimately did not buy from InvenSense, and that InvenSense had been too slow in writing down the value of this inventory. *Id*. ¶ 19. Plaintiff alleges that defendants should have written off "$6.90 million of product inventory" for these chips earlier than it did, and that defendants "knew or were reckless in not knowing [that this inventory] was excess, obsolete or unsalable by no later than June 29, 2014." *Id*. ¶ 57.

Plaintiff also takes issue with another announcement the Company made on October 28, 2014 -- that its "gross margins had plummeted to 37%, substantially lower than the 50% gross margin defendants had reported on July 29, 2014, which they assured the market would remain 'consistent' through 2Q15." *Id*. ¶ 51. Plaintiff alleges that the earlier assurances of consistent gross margins were false and misleading because Apple's June 2014 purchase order for the Company's 6-axis MEMS chips "set pricing below InvenSense's other '10% customers' (customers whose purchases were 10% or more of InvenSense's sales volume)," and defendants

knew or were reckless in not knowing that this pricing would reduce InvenSense's margins. *Id.* ¶ 13.

Plaintiff consequently sues for defendants' "misleading statements and material omissions on July 29, 2014 and August 7, 2014 regarding InvenSense's excess and obsolete inventory and the Company's pricing and margin on chips to be sold to Apple Inc. ('Apple') for use in the iPhone 6 and 6 Plus." *Id.* ¶ 1. Defendants raise the usual objection in securities cases that plaintiffs' allegations do not satisfy the heightened pleading standards required in a securities fraud action. Specifically, defendants contend that plaintiffs have failed sufficiently to plead falsity and scienter. Dkt. No. 64 at 2. Defendants additionally contend that "[t]he margin forecast qualifies for the safe harbor" provided for forward-looking statements under the PSLRA, and as such, "cannot serve as a basis for liability in this case." *Id.*

## DISCUSSION

### I. LEGAL STANDARD

Well-established standards govern this motion to dismiss. To comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2) and survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly* at 556). In evaluating a motion to dismiss, the Court assumes that the plaintiff's allegations are true and draws all reasonable inferences in his or her favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). The Court need not, however, "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the Court dismisses a complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (internal quotation marks and citation omitted).

Additional requirements apply because this is a securities fraud class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5. "To plead a claim under Section 10(b) and Rule 10b-5, the plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Here, defendants do not contest elements (3) through (6), and so the Court focuses on whether plaintiff has adequately pled the first two elements: falsity and scienter.

In a securities fraud action, the circumstances constituting the alleged fraud must be stated with particularity under Federal Rule of Civil Procedure 9(b). *See Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 604. In addition, pursuant to the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). For each alleged misstatement or omission, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u-4(b)(2)(A).

## II.   SECTION 10(b) CLAIM

Plaintiff challenges nine specific statements made by defendants on two different dates, July 29, 2014 and August 7, 2014. *See* Dkt. No. 62-1 (Ex. A to consolidated complaint). Plaintiff groups the statements into two categories: statements about InvenSense's (1) "excess and obsolete inventory," and (2) "pricing and margin on chips to be sold to Apple Inc. ('Apple') for use in the iPhone 6 and 6 Plus." Dkt. No. 62 ¶ 1.

### A. Statements re Inventory

For the inventory-related statements, defendants' primary line of attack is that plaintiff has failed adequately to plead falsity. *See* Dkt. No. 72 at 1-6. A statement or omission is actionably false if it creates an "impression of a state of affairs that differ[s] in a material way from the one

4

that actually exist[s]." *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) (citation omitted). To plead falsity under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

Plaintiff challenges these statements as false:

- In the July 29, 2014 press release (and as was "repeated at [the] 7/29/14 earnings conference call and in [the] 8/7/14 Form 10-Q"), defendants stated the value of InvenSense's "inventories" as of June 29, 2014 as $77,513,000. Dkt. No. 62-1 at 1. Plaintiff explains that this statement was false and misleading because, among other things, "InvenSense improperly failed to write-off at least $6.90 million of excess, obsolete or unsalable 3-axis MEMS chip inventory by no later than the quarter ended 6/29/14 (1Q15) pursuant to GAAP." *Id.*

- In an earnings conference call on July 29, 2014, Abdi stated, "Having strategically built inventory ahead of anticipated demand for our second generations [*sic*] 6-axis products in previous quarters, we are now able to meet significant new customer requirements even while we continue to add manufacturing capacity and ramp into production our third-generation 6-axis products." *Id*. at 2.

- In the same conference call, Krock stated, "To support this Q2 fiscal 2015 revenue outlook, we currently have backlog in place representing a majority of this total current quarter revenue target." *Id*.

Critical to the determination of this motion is the reason why plaintiff believes the statements above are false and misleading. The essential allegations on that point are:

- InvenSense was unsuccessful in securing a "design win" for the original iPhone (June 2007), the follow-on iPhone 3, the iPhone 4 (2010), and iPhone 5 (September 2012). Dkt. No. 62 ¶¶ 4-7. Apple instead selected STMicro's chips for inclusion in the iPhone 4 and iPhone 5. *Id*. ¶¶ 5, 7.

- One of the reasons identified for these losses was the concern that InvenSense "was too small to have the capacity or financial resources to support the volume of chips Apple demanded." *Id*. ¶ 5.

- After the loss to STMicro for the iPhone 5 in September 2012, defendant Abdi ousted InvenSense's founder and then-CEO Steve Nasiri from the Company and installed himself as the new CEO and President, "with a promise to get InvenSense's chips into an Apple iPhone." *Id*. ¶¶ 2, 7.

5

- InvenSense was "given the opportunity to work with Apple to develop a MEMS chip specifically for the [iPhone] 5S and 5C handsets," scheduled for release in September 2013. *Id.* ¶ 8. "To allay any concerns Apple had about InvenSense's manufacturing capacity, InvenSense began volume production of 3-axis MEMS sensors for the iPhone 5S and 5C before Apple had committed to putting the chips into the handsets. By the end of June 2013, InvenSense had built up an inventory of approximately 20 million 3-axis MEMS chips that were specifically for the iPhone 5S and 5C." *Id.*

- Apple ultimately again chose STMicro's chips for inclusion in the iPhone 5S and 5C, and so "InvenSense was left with approximately 20 million 3-axis MEMS chips specifically designed for the iPhone 5S and 5C." *Id.* ¶ 9.

- For various reasons, these 3-axis chips became "excess, obsolete or unsalable by no later than June 29, 2014," and consequently, under GAAP, their value should have been written down prior to July 29, 2014, the beginning of the Class Period. *Id.* ¶¶ 9, 48, 57-65.

- InvenSense, however, failed to take this charge until October 28, 2014, when it announced that it would be taking a $7.4 million dollar charge "to write down earlier generation inventory that is now [in] excess or obsolete." *Id.* ¶ 19.

- Moreover, this failure to take the write-down earlier was intentional on InvenSense's part. InvenSense chose to keep "nearly all of the approximately 20 million iPhone 5S and 5C chips on its books at full value" and even "reported significant increases in the value of the Company's inventory for the quarters ended December 29, 2013 and March 30, 2014 (3Q14 and 4Q14)," so that it could show the public and Apple "that inventory and capacity were not a concern." *Id.* ¶ 11. (And InvenSense was in fact rewarded with a design win at last for the Apple iPhone 6 and 6 Plus in June 2014. *Id.* ¶ 13.)

These are not trivial allegations, and if the test were simply *Twombly* plausibility alone, the Court would find that plaintiff has amply stated a claim. Even under the PSLRA, the Court would find that plaintiff has adequately specified each statement alleged to have been misleading, and the reason or reasons why the statement is misleading. *See* 15 U.S.C. § 78u-4(b)(1).

But the allegations fall just shy of enough. This is because plaintiff has failed to meet the heightened particularity requirement imposed by Federal Rule of Civil Procedure 9(b), as well as the PSLRA's additional requirement that, when "an allegation regarding [a] statement or omission

6

is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

It is important to note here that, as the Court stated at the hearing on this motion with no objection by defendants, a securities plaintiff is not required to have confidential witnesses as a source for the allegations in the complaint. *See* Dkt. No. 75 at 8:7-11. Plaintiff does, however, need to identify *some* source for how it knows of the key, very detailed factual allegations in its complaint that support its theory of falsity, *e.g.*, that "by the end of June 2013, InvenSense had built up an inventory of approximately 20 million 3-axis MEMS chips that were specifically for the iPhone 5S and 5C"; or that these chips, which had an "approximate cost of $0.44 per chip" became unsalable because, among other things, they "suffered from manufacturing yield problems and did not meet any high-volume customer's specifications." Dkt. No. 62 ¶¶ 8, 58-60.

It is not enough for plaintiff simply to state as an introduction to the complaint that its allegations are "based upon personal knowledge . . . , and upon an investigation conducted by and through lead plaintiff's attorneys, which included, *inter alia*, a review of the United States Securities and Exchange Commission ('SEC') filings made by InvenSense, Inc. ('InvenSense' or the 'Company'), Company releases, conference calls, public statements issued by defendants, media reports, analyst reports and consultation with persons familiar with InvenSense's business including former employees of InvenSense." *Id*. at 1. And it most definitely is not enough for plaintiff merely to allege that it "believes substantial additional evidentiary support will likely exist for the alegations set forth herein after a reasonable opportunity for discovery." *Id*.

Because this case is governed by Rule 9(b) and the PSLRA, plaintiff must do more than these current efforts to get past a Rule 12(b)(6) challenge. As our Circuit held in *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 985 (1999), the requirement that a plaintiff must "state 'with particularity all facts on which [her] belief is formed,'" means that "a plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief. It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim."

7

In *In re Textainer Partnership Securities Litigation*, Case No. C-05-0969 MMC, 2005 WL 3801596 (N.D. Cal. Mar. 8, 2005), Judge Chesney dismissed for this very reason another securities complaint that was also subject to the PSLRA. In that case, one of plaintiff's main allegations was that defendants had made a materially false and misleading statement because of their failure to disclose that "the price of shipping containers had increased by approximately 18-20%." The Court dismissed that claim with leave to amend because plaintiff had "cite[d] no source for his contention that container prices rose 18-20% between July 2004 and January 2005." *Id*. at *2, 7. The Court found that this did not meet the PSLRA's requirement that a complaint reveal "facts demonstrating the reliability of [plaintiff's] assertions." *Id*. (citing *Silicon Graphics*, 183 F.3d at 985).

The Court finds that the same conclusion applies here, and consequently dismisses plaintiff's claims for the inventory-related statements with leave to amend. Any amended complaint must add allegations identifying the sources of plaintiff's beliefs for the factual allegations that support plaintiff's claims of falsity.[2]

### B. Statements re Gross Margin

Plaintiff also challenges statements about the Company's gross margin. There are six statements, all of which were made during an earnings conference call on July 29, 2014. The first statement was made by Abdi, and the rest were made by then-CFO Krock:

- "While we expect gross margins at some of our top tier customers to remain under pressure, as a result of high-volume pricing, as well as lower initial manufacturing yields as we ramp new products into production, we believe our higher value system solutions combined with our aggressive manufacturing cost reductions, will keep our overall gross margins at consistent levels." Dkt. No. 62-1 at 8.

---

[2] Because plaintiffs have failed sufficiently to plead falsity, the Court need not reach the issue of scienter. *See In re Mellanox Tech., Ltd.*, No. 13-cv-4909-JD, 2014 WL 7204864, at *5 (N.D. Cal. 2014). The scienter analysis on the next round of 12(b)(6) motions (if there is one), will likely depend a great deal on the sources plaintiff newly identifies in the amended complaint. The Court consequently declines to address the parties' scienter arguments at this time.

- "Product mix for the current quarter continues to favor our highest volume mobile customers. And we should generate a total gross margin in line with recent levels. We believe that on a GAAP basis our Q2 FY15 gross margin will be in a range around 48% continuing to now modestly reflect the impact of additional cost of amortization of intangibles acquired." *Id*.

- "On a non-GAAP basis, Q2 FY15 gross margin is expected to be consistent with recent past quarters that is in the range around 50%. In future quarters, lower-cost of products, additional production volumes, and improving product yields should contribute to a favorable impact on our gross margin. Therefore our target non-GAAP gross margin remains unchanged." *Id*. at 9.

- "We expect our spending in margin opportunities for our FY15 -- we continue to expect gross margins generally consistent with our recent past and FY14 on a non-GAAP basis and on a GAAP basis in a range of around approximately 48%." *Id*.

- "There's no significant difference in trends quarter on quarter. I know many investors do look at the SEC filings and so forth, which include information on that. Generally percentage of 6-axis average selling price of 6-axis product, steps we take to manufacture, or manage manufacturing cost and so forth generally very consistent trends with recent past. Therefore, generating a very consistent gross margin level with the last couple quarters as well." *Id*. at 10.

- "But generally it's about the value of these sensor function in the market with the Gyro and integrated sensor attached. So there's no one customer with any particular window of pricing that's relevant." *Id*.

Defendants' main attack is that these statements are not actionable because they fall under the "safe harbor" provided by the PSLRA. Dkt. No. 64 at 6-8. The PSLRA "provides an additional barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'" *In re Cutera*, 610 F.3d 1103, 1111 (9th Cir. 2010). Forward-looking statements fall within the safe harbor set out in 15 U.S.C. § 78u-5(c)(1) in either of these two circumstances: "if they were identified as forward-looking statements and accompanied by meaningful cautionary language, under subsection (A)(i); or if the investors fail to prove the projections were made with *actual* knowledge that they were materially false or misleading, under subsection (B)." *Id*. at 1111-12 (emphasis in original). Under the former subsection, "if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of

9

the plaintiff's showing of scienter." *Id*. at 1112. That is the situation defendants contend applies to the gross margin statements here. Dkt. No. 64 at 8.

The questions, then, are whether the gross margin statements identified by plaintiff are "forward-looking statements" under the statute, and if so, whether they were accompanied by "meaningful cautionary statements." On the first question, even plaintiff acknowledges that defendants' statements regarding gross margin "were couched as statements of expectations." Dkt. No. 69 at 8. The Court finds that these statements are quintessential forward-looking statements. Significantly, the PSLRA itself expressly defines as a "forward-looking statement" a statement "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, *or other financial items*," as well as "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A) & (C) (emphasis added). The Court has no doubt that the statements challenged by plaintiff squarely fit these definitions.

Plaintiff suggests that these statements should not be treated as forward-looking within the safe harbor because "they were purportedly predicated on then-known and current facts . . . ." Dkt. No. 69 at 8. But the Court rejects this argument. The PSLRA expressly includes in its definition of "forward-looking statement" "any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)" (*i.e.*, statements projecting revenues, income or other financial items, statements of the plans and objectives of management for future operations, and statements of future economic performance). 15 U.S.C. § 78u-5(D). Plaintiff's "then-known and current facts" argument is simply another way of taking issue with defendants' statements about the assumptions underlying or relating to their forward-looking, gross margin statements. But defendants' statements about those assumptions, too, are expressly protected as forward-looking statements in their own right under the PSLRA.

Under *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014), statements are protected as forward-looking statements if, "examined as a whole, the challenged statements related to future expectations and performance." That description fits the statements here. Even to the extent the statements identified by plaintiff may

10

be interpreted to contain some non-forward looking portions, "in context," these statements are "properly understood as regarding [defendants'] expectations of [what] the future" gross margins would be. *Id*. at 1059. They may consequently be regarded in their entirety as forward-looking statements falling within the scope of the safe harbor.

Plaintiff also takes issue with the fact that the supposed cautionary language put forward by defendants "was virtually identical to the introductory language with which they began each of InvenSense's five prior earnings calls." Dkt. No. 69 at 8. But plaintiff cites no case holding that cautionary language becomes less effective with each repetition, and the Court is aware of no case so holding. Rather, the Court finds that the cautionary language used here is "virtually identical to the cautionary language approved" in other cases. *Police Retirement System*, 759 F.3d at 1059.

All six of the gross margin-related statements challenged by plaintiff were made in the July 29, 2014 earnings conference call. Dkt. No. 62-1 at 8-10. That call began with this statement by Leslie Green, in InvenSense's "IR" (presumably investor relations) department:

> Leslie Green - InvenSense Inc - IR
>
> Thank you, Whitley, and good afternoon, everyone. I would like to begin our call with the Safe Harbor disclaimer related to forward-looking statements.
>
> Statements in this conference call, that are not historical, are forward-looking statements as the term is defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements are generally in the future tense and/or are preceded by words such as will, expect, anticipates or other words that imply or predict a future state.
>
> Forward-looking statements include any projection of revenue, gross margin, which can be significantly impacted by product yields and inventory carrying values. Expense or other financial items discussed in this conference call, including the expansion of our customer design pipeline. And the potential for continued gains in our share of the mobile, computing, and consumer segment.
>
> Investors are cautioned that all forward-looking statements involve risks and uncertainties that can cause actual results to differ from those currently anticipated due to a number factors including without limitation, the continued adoption of microphones, MotionTracking and motion sensing as an interface in consumer electronic products, our achievement of design wins, consumer acceptance of customers products that incorporate our solutions, intense competition in our industry.

11

> Our dependence on a limited number of customers for substantial portion of our revenues, our lack of long-term supply contracts and dependence upon a limited sources of supply. Our ability to continue to develop and introduce new and enhanced products on a timely basis and potential decreases in average selling prices for our products, as well as changes in economic conditions and other risk factors discussed in documents filed by us with these Securities and Exchange Commission from time to time.
>
> Copies of InvenSense SEC filings are posted on the Company's website and are therefore available from the Company, without charge. Forward-looking statements are made as of the date of this conference call. And the Company does not undertake any obligation to update its forward-looking statements to reflect future events or circumstances.
>
> With that, let me introduce, Behrooz Abdi, President and CEO.

Dkt. No. 65, Ex. 3 (Transcript of July 29, 2014 earnings call) at ECF pp. 220-21.[3]

This was a fulsome disclaimer, and what is striking about it is that it encompasses and significantly expands on the kind of language our Circuit has already found to be adequate. *See Police Retirement System*, 759 F.3d at 1059 (quoting disclaimer, and finding it "virtually identical to the cautionary language approved in *Cutera*: '[T]hese prepared remarks contain forward-looking statements concerning future financial performance and guidance . . . management may make additional forward-looking statements in response to questions, and . . . factors like Cutera's ability to continue increasing sales performance worldwide could cause variance in the results.'") (quoting *Cutera*, 610 F.3d at 1112). As the Circuit found in those cases, here, too, the Court finds the cautionary language quoted above was sufficient to count as "meaningful" under the PSLRA. It is consequently the Court's finding that the forward-looking statements relating to gross margin that have been challenged here by plaintiff are exempt from liability under PSLRA's safe harbor provision. *See Police Retirement System*, 759 F.3d at 1060. The Court therefore dismisses with prejudice plaintiff's claims to the extent they challenge defendants' gross margin-related statements identified in the complaint.

---

[3] Defendants have requested that the Court take judicial notice of this document. Dkt. No. 65. Plaintiff does not object to the taking of judicial notice, although plaintiff does object to the Court "accept[ing] any of the materials for the truth of the matters asserted." Dkt. No. 71. The Court consequently takes judicial notice of this document. The Court finds it unnecessary to review or to address the propriety of the other documents the parties have put before the Court on this motion. Dkt. Nos. 65, 70.

### III. SECTION 20(a) CLAIM

"To establish controlling person liability [under Section 20(a)], the plaintiff must show that a primary violation was committed and that the defendant directly or indirectly controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (citation and internal quotation marks omitted). Since plaintiff has not adequately pled a violation of Section 10(b), plaintiff's claim under Section 20(a) must also be dismissed. *See Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 610 (holding that plaintiffs cannot establish control person liability under section 20(a) "because they have not adequately alleged violations of section 10(b) and Rule 10b-5.").

### CONCLUSION

Defendants' motion is granted and the consolidated complaint is dismissed, consistent with this order. Plaintiff's inventory-related claims are dismissed with leave to amend; the gross margin-related claims are dismissed with prejudice.

By April 18, 2016, plaintiff may file either an amended complaint, or a notice of submission to the Court's order dismissing the consolidated complaint, resulting in a final judgment for defendants. Failure to file either an amended complaint or notice of submission may result in dismissal for failure to comply with this order.

**IT IS SO ORDERED.**

Dated: March 28, 2016

JAMES DONATO
United States District Judge