ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
– and –
TOR GRONBORG (179109)
IVY T. NGO (249860)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
ingo@rgrdlaw.com

Lead Counsel for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re INVENSENSE, INC. SECURITIES LITIGATION | Case No. 3:15-cv-00084-JD |
| This Document Relates To: ALL ACTIONS. | <u>CLASS ACTION</u> |
| | FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

## TABLE OF CONTENTS


Page

I. NATURE OF THE ACTION ..... 1

II. BACKGROUND AND SUMMARY OF THE ACTION ..... 1

III. JURISDICTION AND VENUE ..... 10

IV. THE PARTIES ..... 10

- A. Lead Plaintiff ..... 10
- B. The Corporate Defendant ..... 10
- C. The Individual Defendants ..... 11

V. DEFENDANTS' FALSE STATEMENTS AND MATERIAL OMISSIONS ..... 14

- A. Defendants' July 29, 2014 Misstatements and Omissions ..... 14
- B. Defendants' August 7, 2014 Misstatements and Omissions ..... 16
- C. Defendants' Class Period Statements Regarding Inventory, Gross Profit and Earnings Were False and Misleading ..... 16
- D. Defendants' Class Period Statements Regarding Pricing Terms with Apple ..... 18

VI. THE TRUTH ABOUT INVENSENSE'S INVENTORY AND PRICING OF 6-AXIS MEMS CHIPS FOR APPLE IS DISCLOSED ..... 19

VII. INVENSENSE'S FALSE FINANCIAL STATEMENTS VIOLATED GAAP ..... 21

VIII. ADDITIONAL SCIENTER ALLEGATIONS ..... 24

IX. LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS ..... 26

X. CLASS ACTION ALLEGATIONS ..... 29

XI. PRAYER FOR RELIEF ..... 33

XII. JURY DEMAND ..... 34

Lead Plaintiff the Vossen Group alleges the following based upon personal knowledge as to itself and its own acts, and upon an investigation conducted by and through Lead Plaintiff's attorneys, which included, *inter alia*, a review of the United States Securities and Exchange Commission ("SEC") filings made by InvenSense, Inc. ("InvenSense" or the "Company"), Company releases, conference calls, public statements issued by defendants, media reports, analyst reports and consultation with persons familiar with InvenSense's business, including former officers and employees of InvenSense. The sources of Lead Plaintiff's beliefs for the following factual allegations are referenced herein. In addition, Lead Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought against InvenSense and two of its senior officers for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder. This action is brought on behalf of all persons or entities who purchased InvenSense common stock between July 29, 2014 and October 28, 2014, inclusive (the "Class Period"). Lead Plaintiff brings this action against InvenSense, its Chief Executive Officer ("CEO") and President Behrooz Abdi ("Abdi"), and its former Chief Financial Officer ("CFO") Alan Krock ("Krock") (collectively, "Defendants"). This action concerns Defendants' misleading statements and material omissions on July 29, 2014 and August 7, 2014 regarding InvenSense's excess and obsolete inventory and the Company's contractual pricing terms with Apple Inc. ("Apple") for the sale of chips to be used in the iPhone 6 and 6 Plus.

## II. BACKGROUND AND SUMMARY OF THE ACTION

2. InvenSense was founded in 2003 by Steve Nasiri ("Nasiri"). Under Mr. Nasiri's leadership, the Company was a pioneer in the advancement of motion processing solutions and micro-electro-mechanical system ("MEMS") technology. The Company's MEMS chips are used to track complex user motions through motion sensors, including microscopic gyroscopes and accelerometers, based upon the patented Nasiri-Fabrication platform. As it grew under Mr. Nasiri,

InvenSense targeted its MEMS chips to manufacturers of consumer electronics, such as portable video gaming devices and, increasingly after 2007, smartphones and tablets.

3. From its founding, InvenSense's ability to secure new customers depended on winning competitive processes, known as "design wins," over its key competitors – particularly the Company's larger and more-established rival STMicroelectronics N.V. ("STMicro"). As InvenSense acknowledged in its SEC filings, "[t]hese selection processes are typically lengthy," the "sales cycle for [its] products is long," and "all of [its customers] purchase [its] products on a purchase order basis." *See, e.g.*, InvenSense, Inc. Annual Report (Form 10-K) (May 29, 2014) ("2014 Form 10-K") at 4.[1] The MEMS chips designed by InvenSense were typically highly customized and for a specific product integration. Accordingly, while Mr. Nasiri was CEO and President, InvenSense followed a policy of only beginning volume production for a customer after achieving a design win. *See, e.g.*, InvenSense, Inc. Annual Report (Form 10-K) (June 19, 2012) at 13 ("Volume production can begin shortly after the design win.").

4. The market for MEMS chips began to explode following the introduction of Apple's original iPhone in June 2007, one of the first smartphones to use a multi-touch interface. Within 18 months of the iPhone's introduction, smartphone sales had gone from essentially zero to more than 139 million units a year. Total sales of smartphones, nearly all of which contained motion sensing technology, exceeded 500 million units by the end of 2009, and Apple's iPhone was widely acknowledged to be the preeminent and most profitable smartphone on the market. InvenSense's chips, however, were not included in the original iPhone or follow-on iPhone 3, and the Company was having difficulties breaking into the smartphone market. As Mr. Nasiri acknowledged, "InvenSense didn't yet have the capacity to try to sell to Apple (AAPL) when Apple was building its first iPhones and iPads with motion-sensing features like touch-screens and compasses." Amy Reeves, *Invensense, Wii Motion-ChipMaker, Up in IPO Debut*, Investor's Business Daily, Nov. 16, 2011.

---

[1] For financial reporting, InvenSense employs a fiscal year ("FY") ending on the Sunday closest to March 31, and its fiscal quarters are 13 weeks long. The FY14 ended March 30, 2014, the first quarter of FY15 ended June 29, 2014 ("1Q15") and the second quarter of FY15 ended September 28, 2014 ("2Q15").

5. By 2010, Mr. Nasiri and InvenSense were working with Apple to develop a MEMS chip for the iPhone 4. While the chips were technologically sound and had best-in-class capabilities, InvenSense lost the iPhone 4 contract to STMicro over concerns that the Company was too small to have the capacity or financial resources to support the volume of chips Apple demanded. *See* R. Colin Johnson, *MEMS gyro/accelerometer combo chip debuts*, EE Times, Nov. 9, 2010 ("According to analysts, Invensense worked with Apple Inc. during the development of its own integrated motion processing capabilities for the iPhone 4, but lost the contract to STMicroelectronics NV over concerns that a small company like Invensense – with projected sales of about $80 million in 2010 – could not meet demand."); Khadir Richie, *InvenSense (INVN) – Running Away for all the Wrong Reasons*, True Investing, Sept. 3, 2012 ("*True Investing* article") ("The Company initially won the product design specs for the iPhone; however, the Company did not have the capacity or financial resources to support the volumes that Apple required."). As a result of once again being left out of the iPhone, InvenSense was having difficulties striking deals with other major mobile device manufacturers for the Company's high-end chips. According to Mr. Nasiri, other manufacturers "'weren't willing to take any bets on any new functions unless Apple had embraced it.'" Karsten Strauss, *Microchips Maker InvenSense Wants a Slice of Apple*, Forbes India, Nov. 14, 2013 ("*Forbes* article").

6. To address Apple's concerns about capacity and financial resources, in November 2011, InvenSense went public and raised $75 million in its initial public offering. At this time, Defendant Abdi was a director on the Company's Board of Directors ("Board") and Mr. Nasiri was still the CEO and President. Through the offering, it was thought that InvenSense would be in a much better position to land a design win for the forthcoming iPhone 5. *See* Shareholder Unite, *Why You Should Accumulate InvenSense*, Seeking Alpha, May 14, 2012 ("But now, with the IPO money, the company is much better placed so there is a reasonable chance for them to land an Apple deal, like the iPhone5.); *True Investing* article ("As a public company, INVN is now well positioned with $160mm on the balance sheet to re-capture opportunities with Apple . . . .").

7. When Apple launched the iPhone 5 on September 21, 2012, however, it was revealed that Apple had, once again, selected a MEMS chip from STMicro over any InvenSense product.

Little more than one month later, despite Mr. Nasiri's success in expanding the Company's sales and customer base to mobile device manufacturers other than Apple, Defendant Abdi and InvenSense's Board ousted Mr. Nasiri. Abdi installed himself as the CEO and President of the Company with a promise to get InvenSense's chips into an Apple iPhone. *See Forbes* article ("Hardly anyone seemed to register the seismic change last October, either, when the board ousted founder and CEO Steve Nasiri and replaced him with tech veteran Behrooz Abdi. It was a classic entrepreneurial putsch: Get rid of the visionary, do-it-all-yourself guy and bring on the management expert who can scale the company."); Noel Randewich, *Chipmaker InvenSense aims to guide you through malls, subways*, Reuters, Jan. 9, 2013 ("Abdi declined to comment on Sunnyvale, California-based InvenSense's relationship with Apple, but he said he expects to provide sensor chips to all top tier phonemakers this year.").

8. The next generation of the iPhone, the iPhone 5S and 5C, was scheduled to be released in September 2013. Once again, InvenSense was given the opportunity to work with Apple to develop a MEMS chip specifically for the iPhone 5S and 5C handsets. While under Mr. Nasiri, InvenSense had adhered to the policy of not beginning volume production of a chip until after achieving a design win, Abdi was desperate to make good on his promise to get an InvenSense chip into an iPhone. To allay any concerns Apple had about InvenSense's manufacturing capacity, InvenSense began volume production of 3-axis MEMS sensors for the iPhone 5S and 5C before Apple had committed to putting the chips into the handsets. By the end of June 2013, InvenSense had built up an inventory of approximately 20 million 3-axis MEMS chips at a manufacturing cost of approximately $0.44 per chip that were specifically for the iPhone 5S and 5C. Analysts and industry observers noted the growth in InvenSense's reported inventory and speculated that it was the result of the Company finally getting into the newest version of the iPhone.

9. When the iPhone 5S and 5C were launched on September 20, 2013, it was revealed that Apple had, again, gone with a MEMS chip from STMicro. Even with the pre-design win production of approximately 20 million chips, Abdi had failed to overcome the perception that InvenSense did not have the capacity to fully supply Apple while meeting commitments to other customers. As a result, InvenSense was left with approximately 20 million 3-axis MEMS chips

specifically designed for the iPhone 5S and 5C. Given the unique nature of the chips, the only viable market other than Apple was white box (generic) Chinese handset vendors and Chinese toy manufacturers. These manufacturers had limited needs (no more than a few million chips), could only utilize a small percentage of the chip's capabilities and would only pay, at most, a few cents more than the cost of the chips. Nevertheless, InvenSense only wrote down an "insignificant" amount of inventory in FY14. *See* 2014 Form 10-K.

10. Despite failing to obtain the iPhone 5S and 5C design win, Abdi continued to insist that he would get InvenSense chips into an Apple product. In the November 14, 2013 *Forbes* article titled "Microchips Maker InvenSense Wants a Slice of Apple," Abdi assured investors that "'[y]ou will see a very marked difference in the future of the company,'" which the article suggested could be "in the next teardown of an Apple device." Given what had happened to InvenSense's founder and former CEO, Mr. Nasiri, however, Abdi knew that the window to make good on his assurances was shrinking.

11. Rumors about the launch of Apple's iPhone 6 were circulating publicly as early as December 2013. To prevent another design loss with Apple, Abdi knew that InvenSense had to demonstrate that it could satisfy all of its obligations to other customers while committing virtually all of its capacity to meeting Apple's demands. This meant that by the time Apple awarded the MEMS chip design win for the iPhone 6 and 6 Plus, in or about June 2014, InvenSense would need to be able to show that inventory and capacity were not a concern. To do that, InvenSense kept nearly all of the approximately 20 million iPhone 5S and 5C chips on its books at full value and reported significant increases in the value of the Company's inventory for the quarters ended December 29, 2013 and March 30, 2014 (3Q14 and 4Q14).

12. In a press release issued by the Company on May 1, 2014, defendant Abdi stated that part of the "'increased investment in research and development'" in 2014 supported "'extensive new product and customer qualification activities'" and explained that the Company had "'made a strategic decision in both fiscal Q3 and Q4 to build inventory in our core products. This positions us to increase our capacity in a more linear fashion at optimum cost, while we prepare for multiple significant customer ramps in the coming quarters.'" InvenSense, Inc., Form 8-K (May 1, 2014).

Abdi provided more detail in a May 26, 2014 interview with *The Wall Street Transcript*, describing the built-up inventory as "products that we feel that have very low risk because they are broad-based products, and a lot of customers and healthy demand. And we built enough inventory to make sure that when the bump comes in, when the huge ramp comes in the second half of the year, we are well-prepared for that." Company Interview, Behrooz Abdi, *The Wall Street Transcript*, May 26, 2014.

13. The public campaign touting InvenSense's growing inventory of in-demand products achieved its goal of addressing Apple's concerns. On or around June 24, 2014, InvenSense finally secured a design win with Apple when the Company's 6-axis MEMS chip was selected for the iPhone 6 and 6 Plus. *See* Ashok Kumar, *A Possible iPhone 6 Win – Increasing Our Price Target to $24 from $21 and Maintaining Outperform Rating*, Imperial Capital, June 24, 2014 ("Based on our recent discussions with certain of Apple's supply chain partners, we are of the opinion that InvenSense may have secured a win as the designer of the six-axis accelerometer (an accelerometer and gyro combination) for the expected next-generation, 4.7-inch, iPhone 6."). Apple's contract with InvenSense (as with other suppliers) required that the design win be kept confidential until the iPhone 6 products were released, and such nondisclosure agreements with Apple called for penalties as high as $50 million per violation. As later revealed, Apple's purchase order for 6-axis MEMS chips for the iPhone 6 and 6 Plus also set pricing below InvenSense's other "10% customers" (customers whose purchases were 10% or more of InvenSense's sales volume), reducing InvenSense's margins on chips sold to Apple to approximately 40% as compared to the approximately 50% margins it obtained, on average, from Samsung, LG and other customers. *See* Romain Fraux, *Reverse Costing Analysis InvenSense MP67B 6-Axis IMU in iPhone 6 & 6 Plus*, System Plus Consulting, Jan. 2015 ("6-axis Cost Analysis") at 107-108. Apple also had the ability to rescind the purchase order if it was determined that InvenSense could not meet Apple's demands for its iPhone 6 products.

14. On the start of the Class Period, July 29, 2014, InvenSense announced financial results for the quarter ended June 29, 2014 (1Q15) and hinted at the fact that the Company had finally scored a design win with Apple. Defendants Abdi and Krock told investors that InvenSense was entering a "period of significant growth," would "have at least one new 10% customer as of

September" (the iPhone 6 was scheduled for release in September 2014) and had made progress at "major customers" "headquartered in both the United States and China" (during 2014, Apple was the only major smartphone manufacturer headquartered in the United States).

15. As they had with Apple, Defendants assured the market that InvenSense had the capacity to meet Apple's demands for the iPhone 6 and 6 Plus while also meeting obligations to the Company's other customers. Abdi specifically told investors that "[h]aving strategically built inventory ahead of anticipated demand for our second generation 6-axis products in previous quarters, we are now able to meet significant customer requirements even while we continue to add manufacturing capacity and ramp into production our third generation 6-axis products." 1Q15 InvenSense Inc. Earnings Call, July 29, 2014 at 6. Krock added that "we currently have backlog in place representing a majority of this total current quarter revenue target" "of $86 million to $91 million." *Id.* at 7. Buttressing this statement, in the Company's financial results, Defendants claimed that the value of InvenSense's inventory had actually increased by $4.5 million from the prior quarter. But for the approximately 20 million iPhone 5S and 5C chips being kept on the books at full value in violation of Generally Accepted Accounting Principles ("GAAP"),[2] however, InvenSense would not have been able to report an increase in the value of the Company's inventory.

16. While expanding sales was obviously good news, investors and analysts focused on the average selling price ("ASP") of InvenSense's products when it started shipping 6-axis MEMS chips to the not-so-secret new, high-volume customer. With InvenSense's purported inventory of high-end 6-axis products, Defendants assured the market that, for 2Q15, "there's no one customer with any particular window of pricing that is relevant" – despite Apple receiving unprecedented pricing discounts. Based on Defendants' July 29, 2014 statements, analysts were encouraged about

---

[2] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB"). SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure that would be duplicative of disclosures accompanying annual disclosures, per 17 C.F.R. §210.10-01(a).

InvenSense's prospects – even after they took into account volume discounts to Apple which they expected to be "similar to Samsung's." *See* Zachary Amsel, *Emerging as Dominate Player*, Evercore, July 30, 2014. An analyst with Canccord Genuity on August 8, 2014 even provided ASP estimates of "roughly $0.80 for 6-axis gyros into both Samsung and Apple" versus "roughly $1.00 for other OEMs," which took into account Samsung and Apple's "scale and pricing power."

17. Less than one month after making the July 29, 2014 statements, Krock sold more than 96% of his InvenSense stock for proceeds of $3,173,650 and then promptly resigned from his position as CFO. As one analyst said at the time, "[t]his comes as a surprise to us given Mr. Krock's commitment to the investment community and his knowledge of where the INVN business model was heading." Tiernan Ray, *InvenSense: New CEO Signals Broader Ambition, Say Needham, Evercore*, Barron's, Aug. 26, 2014 (quoting Needham & Co.).

18. Then, on September 19, 2014, Apple released the iPhone 6 and 6 Plus and it was confirmed that those smartphones contained an InvenSense 6-axis MEMS chip. Consistent with the market's expectation that an InvenSense MEMS chip had finally been utilized by Apple, the Company's stock price did not substantially react to the confirmation that the iPhone 6 and 6 Plus included the Company's chip. Within just three days of its release, Apple sold more than 10 million iPhone 6 products and had manufactured and begun to distribute tens of millions of additional iPhone 6 and 6 Plus units.

19. Defendants stayed silent following the release of the iPhone 6 and 6 Plus until October 28, 2014. After the market closed that day, the truth about Defendants' misrepresentations and omissions was revealed when, instead of announcing positive results due to finally adding Apple as a customer, the Company shocked investors with disappointing financial results for the quarter ended September 28, 2014 (2Q15). Specifically, Defendants disclosed that InvenSense would have to take a $7.4 million dollar charge "to write down earlier generation inventory that is now [in] excess or obsolete" – largely the 20 million 3-axis MEMS chips that had been built for the iPhone 5S and 5C – and due to increased sales to large-volume customers – namely, Apple – InvenSense's ASP for its products had dropped considerably. Defendants further acknowledged that the percentage of sales to 10% plus customers, of which there were only two (Apple and Samsung), was largely

unchanged – from 52% in 1Q15 to 55% in 2Q15 – leaving the pricing arrangement with InvenSense's new customer, Apple, as the only material change.

20. As set forth in the chart below, the October 28, 2014 disclosure of the truth about InvenSense's obsolete inventory and pricing arrangement with Apple caused the Company's shares to plummet more than 25% in one day. From a closing price on October 28, 2014 of $21.48 per share, InvenSense's stock price plunged $5.40 per share to $16.08 on October 29, 2014, all while the overall market was actually going up.




21. The bad news for InvenSense and its investors did not end on October 28, 2014. Following the disclosure of the truth about the Company's inventory, Apple opted not to include an InvenSense chip in its iWatch and went back to sourcing MEMS chips from STMicro. InvenSense's stock price has never recovered from the October 28, 2014 disclosures and, more than 14 months after the end of the Class Period, continues to trade well below $15.00 per share.

## III. JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act [15 U.S.C. §78aa] as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

23. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b), as the Company maintains its headquarters in this District at 1745 Technology Drive, Suite 200, San Jose, California 95110.

24. In addition, many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged herein, Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## IV. THE PARTIES

### A. Lead Plaintiff

25. Lead Plaintiff the Vossen Group, as set forth in the certification filed previously on March 9, 2015 (Dkt. No. 37), and as incorporated by reference herein, purchased 33,183 shares of InvenSense stock during the Class Period and has been damaged thereby. The Vossen Group is comprised of class members Gregory Vossen, Albert Di Rienzo and Ed Farley. Messrs. Vossen, Di Rienzo and Farley are residents of Delano, Minnesota, El Paso, Texas and Rye, New Hampshire, respectively. As a result of the conduct alleged herein, the Vossen Group suffered damages and lost over $288,669 from its purchases of InvenSense securities during the Class Period.

### B. The Corporate Defendant

26. InvenSense designs, develops, manufactures and sells MEMS technologies for motion tracking sensors, such as gyroscopes and accelerometers, in consumer electronics. The Company provides small sensors based on its multi-axis technology for consumer electronic devices, including smartphones, tablets, wearable health and fitness accessories and video gaming devices.

As of March 30, 2014, InvenSense had 476 employees and a management team of only ten executives, all of whom were headquartered in San Jose, California.

27. At all relevant times, InvenSense common stock was listed and traded in an efficient market under the symbol "INVN" on the New York Stock Exchange ("NYSE"). InvenSense, through its management and agents, made, and is liable for the misstatements and omissions set forth herein at ¶¶40-44, 46.

**C. The Individual Defendants**

28. Behrooz Abdi joined InvenSense's Board of Directors in June 2011. A little more than one year later, on October 24, 2012, Abdi and the Board stripped Company founder Steve Nasiri of his executive roles and Abdi took over as CEO and President. When Abdi joined the Company, he had approximately 22 years of experience in the semiconductor industry, including in senior executive roles. Throughout the Class Period, Abdi was the CEO and President of InvenSense and had responsibility both for the Company's operations and reporting to the Board and shareholders. Indeed, it was reported in the November 14, 2013 *Forbes* article based on an interview with Abdi that he "consults with [all] nine vice presidents before making most decisions."

29. As part of his responsibilities as CEO and President, Abdi had responsibility for assuring that InvenSense's public financial filings were accurate and complete. For the quarter ended June 29, 2014, and in conjunction with InvenSense's August 7, 2014 financial statements filed with the SEC, Abdi signed a certification pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." To assure that the certification was not simply a hollow gesture, Abdi further confirmed that he, along with then InvenSense CFO defendant Krock, (i) was responsible for establishing and maintaining InvenSense's disclosure controls and procedures, (ii) had designed such controls to assure that material information relating to InvenSense's business, including inventory, was promptly made known to himself, Krock and the Company's small group of senior executives, and (iii) had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other

executives were made aware of material information. At no time before, during or after the Class Period did Abdi assert that he was not aware of material aspects regarding InvenSense's product inventory or MEMS chip business with Apple.

30. Abdi made or had authority over the content of, and how to communicate, the misstatements and omissions set forth herein at ¶¶40-42, 46 and is liable for those misstatements and omissions. Abdi is also liable as a control person of InvenSense within the meaning of §20(a) of the 1934 Act for the misstatements and omissions set forth herein at ¶¶40-42, 46.

31. Alan Krock joined InvenSense in May 2011 and served as the Company's Vice President and CFO until his abrupt resignation on September 2, 2014 "to pursue other opportunities." When Krock joined InvenSense, he had approximately 20 years of experience in both the semiconductor and financial sectors, including significant experience in the areas of current public financial requirements. Throughout his tenure, Krock had responsibility for monitoring and reporting InvenSense's financial results, budgets and financial expectations. Krock also had responsibility, with Abdi, for reporting to the Company's Board and shareholders.

32. As part of his responsibilities as CFO, Krock had primary responsibility for assuring that InvenSense's public financial filings were accurate and complete. For the quarter ended June 29, 2015, and in conjunction InvenSense's August 7, 2014 financial statements filed with the SEC, Krock signed a certification pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." To assure that the certification was not simply a hollow gesture, Krock further confirmed that he, along with defendant Abdi, (i) was responsible for establishing and maintaining InvenSense's disclosure controls and procedures, (ii) had designed such controls to assure that material information relating to InvenSense's business, including inventory, was promptly made known to himself, Abdi and the Company's small group of senior executives, and (iii) had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information. At no time before, during or after the Class Period did Krock assert that he

was not aware of material aspects regarding InvenSense's product inventory or MEMS chip business with Apple.

33. Krock made or had authority over the content of, and how to communicate, the misstatements and omissions set forth herein at ¶¶40-41, 43-44, 46, and is liable for those misstatements and omissions. Krock is also liable as a control person of InvenSense within the meaning of §20(a) of the 1934 Act for the misstatements and omissions set forth herein at ¶¶40-41, 43-44, 46.

34. Abdi and Krock are collectively referred to herein as the "Individual Defendants."

35. Because of their positions with InvenSense, the Individual Defendants had access to adverse undisclosed information about the Company's business, including the Company's inventory and contracts with major customers such as Apple, via access to internal corporate documents (including the Company's reports of actual operations), conversations and connections with other corporate officers and directors, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

36. The Individual Defendants, by virtue of their positions as CEO and CFO of InvenSense, directly participated in the management of the Company, were directly involved in the day-to-day operations of InvenSense at the highest levels and were privy to confidential information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. Abdi and Krock were directly involved in preparing and disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

37. As officers and controlling persons of a publicly-held company whose shares were, and are, registered with the SEC pursuant to the 1934 Act, traded over the NYSE and governed by the provisions of the federal securities laws, Abdi and Krock each had a duty to promptly disseminate accurate and truthful information with respect to the Company's inventory and pricing of chips, including the impact of InvenSense's contract with Apple to supply 6-axis MEMS chips for the iPhone 6 and 6 Plus, and to correct any previously-issued statements that had become materially

misleading or untrue, so that the market price of the Company's publicly-traded shares would be based upon truthful and accurate information. Defendants' misrepresentations and omissions on July 29, 2014 and August 7, 2014 violated these specific requirements and obligations.

38. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of InvenSense's July 29, 2014 press release and conference call statements and August 7, 2014 SEC filing. Abdi and Krock were provided copies of the press release and SEC filing alleged herein to be misleading prior to and shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, Abdi and Krock are responsible for the accuracy of the public reports and releases detailed herein, and are therefore primarily liable for the representations contained therein.

39. Each defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of InvenSense common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme:(i) deceived the investing public regarding InvenSense's business, operations and the intrinsic value of InvenSense common stock; and (ii) caused Lead Plaintiff and other Class members to purchase InvenSense common stock at artificially inflated prices.

## V. DEFENDANTS' FALSE STATEMENTS AND MATERIAL OMISSIONS[3]

### A. Defendants' July 29, 2014 Misstatements and Omissions

40. After the market closed on July 29, 2014, Defendants issued a press release titled "InvenSense Announces First Quarter Fiscal Year 2015 Results." The press release quoted Abdi and reported that InvenSense's inventories had increased $4.5 million, from $73 million to $77.5 million, over the prior quarter and that the Company had gross profit of $31.17 million and a net loss of $4.8 million, or ($0.05) earnings per share ("EPS").

---

[3] Pursuant to the Court's April 23, 2015 Order (Dkt. No. 59), a chart of Defendants' false and misleading statements is attached as Exhibit A. The chart provides on a numbered, statement-by-statement basis: (1) the speaker(s), date(s), and medium; (2) the false and misleading statements; (3) the reasons why the statements were false and misleading when made; and (4) the facts giving rise to a strong inference of scienter.

41. Following issuance of the press release, InvenSense hosted a conference call on July 29, 2014, with analysts and investors to discuss the earnings announcement and the Company's operations. Representing InvenSense on the call were defendants Abdi and Krock. During the call, Defendants reiterated the financial results from the press release and emphasized the growth in InvenSense's business, as bolstered by a design win with a new major customer headquartered in the United States who would contribute "10% or greater . . . revenue" in the upcoming quarter. This new customer, as the market knew, could only be Apple, which was launching its iPhone 6 and 6 Plus in September 2014.

42. During his opening remarks, Abdi assured the market that because the Company had already built up 6-axis inventory for its existing customers' anticipated 2015 launches, it was now able "to meet significant new customer requirements," *i.e.* Apple. Abdi stated, in pertinent part, as follows:

> ***Having strategically built inventory ahead of anticipated demand for our second generations 6-axis products in previous quarters, we are now able to meet significant new customer requirements*** even while we continue to add manufacturing capacity and ramp into production our third-generation 6-axis products.

43. During Krock's opening remarks on the call, he also referenced the "backlog" of high-quality inventory that InvenSense had ready to ship to customers as support for the Company's strong financial outlook for 2Q15. Krock stated, in pertinent part, as follows:

> ***To support this Q2 fiscal 2015 revenue outlook, we currently have backlog in place representing a majority of this total current quarter revenue target***.

44. Later during the call, in response to analyst questions regarding InvenSense's major new customer and ASPs, Krock said that ASPs will be "very consistent" with prior quarters and tempered any concern about the contract with Apple by stating that "generally it's about the value of the[] sensor function in the market with the Gyro and integrated sensor attached. ***So there's no one customer with any particular window of pricing that's relevant***" to the Company's ASPs.

45. Analysts were very encouraged about InvenSense's prospects after the conference call and, recognizing that Apple was the new United States-based customer, and were relieved that the pricing terms with Apple were, as Defendants stated, in line with the pricing terms InvenSense

had with its other high volume customer, Samsung, and would not impact ASPs. For example, a research report from Ascendiant Capital Markets, LLC dated July 30, 2014, stated, in pertinent part, as follows:

> As expected INVN delivered a strong June quarter and provided further evidence that supports our belief of the initial participation in Apple's (AAPL, N/R) portfolio, likely in both the iPhone6 and wearables.
>
> * * *
>
> The only downside of adding a customer the size of Apple, and possibly Xiaomi, is that these unit sizes typically come with volume discounts that limit gross margin upside. However, now that we believe Apple is being incorporated into the firm's guidance for September and the full-year, gross margins look to be stabilizing around the 50% mark, and we believe should set a new base for the company to improve on through growing yields and cost reductions.

### B. Defendants' August 7, 2014 Misstatements and Omissions

46. On August 7, 2014, InvenSense filed with the SEC its 1Q15 Form 10-Q, signed and certified by Abdi and Krock. The 1Q15 Form 10-Q reiterated the financial results reported by the Company on July 29, 2014, including the previously reported inventory valuation, gross profits and EPS. In addition, the 1Q15 Form 10-Q incorporated the Risk Factors included in the FY14 Form 10-K filed on May 29, 2014 without any additions or revisions to inform investors of risks associated with the contractual terms with InvenSense's new, high-volume customer (Apple).

### C. Defendants' Class Period Statements Regarding Inventory, Gross Profit and Earnings Were False and Misleading

47. Defendants' statements on July 29, 2014 and August 7, 2014 regarding InvenSense's inventory, gross profit and earnings, identified in ¶¶40-43, 46, were materially false and misleading when made. Defendants failed to disclose that the Company's financial results were overstated and that approximately 10% of the Company's reported inventory was comprised of 20 million 3-axis MEMS chips that had been manufactured for use in the iPhone 5S and 5C in the summer of 2013, but never sold to Apple. As set forth in ¶¶59-68, and in accordance with GAAP, by no later than the end of 1Q15, Defendants were required to take a $6.90 million charge against the cost of revenue to write down InvenSense's inventory balances to reflect the diminished value of this obsolete inventory. As a result of Defendants' failure to timely write down the iPhone 5S and 5C inventory, InvenSense's reported gross profit was overstated by $6.90 million, a 28% overstatement, and EPS

was overstated by $0.08 per share, a 62% overstatement. But for Defendants' failure to timely write down the iPhone 5S and 5C inventory, InvenSense also would have had to report that its inventory valuation had actually shrunk, and was not "strategically built . . . ahead of anticipated demand," between 4Q14 and 1Q15.

48. During the first half of 2013, Apple's suppliers had begun to prepare production capacity for the launch of 20 million units of Apple's iPhone 5S and 5C. *See, e.g.*, Daniel Shen, Steve Shen, *Apple reportedly to release 2 new iPhones in 3Q13*, Digitimes, May 28, 2013. Concurrently, InvenSense reported a 26% quarter-over-quarter increase in total inventory and 42% increase in finished goods inventory in 4Q13. *See, e.g.*, InvenSense, Inc. Annual Report (Form 10-K)(June 14, 2013) at 77; InvenSense, Inc. Quarterly Report (Form 10-Q) (Feb. 8, 2013) at 12. Given the timing and volume of the inventory increase, industry observers at the time reported that InvenSense must have been the supplier who had "secured the MEMS sensor design" for the iPhone 5S and 5C. *See, e.g.*, Ashok Kumar, *Multiple opportunities at Apple*, Maxim Group, June 28, 2013. InvenSense, however, had not secured the iPhone 5S and 5C design win. The only other potential market for the 3-axis MEMS chips produced for the iPhone 5S and 5C was in the spot market to white box Chinese handset vendors for at or little more than cost (approximately $0.44 per chip). *See, e.g.*, Ashok Kumar, *A no show (thus far) at Apple*, Maxim Group, Sept. 20, 2013; Ashok Kumar, *Back to reality*, Maxim Group, Sept. 23, 2013; Romain Fraux, *Reverse Costing Analysis STMicroelectronics 3-Axis MEMS Gyro in iPhone 5S*, System Plus Consulting, Oct. 2013 at 112-113.

49. Entering 2014, InvenSense still had the excess 3-axis MEMS chips in its inventory as reflected in its finished goods inventory which had not dropped, and indeed continued to increase through 3Q14. *See, e.g.*, InvenSense, Inc. Quarterly Report (Form 10-Q) (Aug. 9, 2013) ("1Q14 Form 10-Q") at 12; InvenSense, Inc. Quarterly Report (Form 10-Q) (Nov. 8, 2013) ("2Q14 Form 10-Q") at 12; InvenSense, Inc. Quarterly Report (Form 10-Q) (Feb. 12, 2014) ("3Q14 Form 10-Q") at 13. By the end of 1Q15 (June 2014), Defendants could not have had any expectation of selling the iPhone 5S and 5C chip inventory for "mid- and lower end smartphones in China" because Chinese OEMs were looking for 6-axis – not 3-axis – MEMS chips. *See, e.g.*, Andrew Uerkwitz, Martin

Yang, *Risk/Reward Balanced, Downgrade to Perform*, Oppenheimer, Mar. 31, 2014). Nevertheless, there was no write down in InvenSense's inventory, which remained above the elevated level reported in the Company's 2014 Form 10-K. *See, e.g.*, 1Q14 Form 10-Q at 12; 2Q14 Form 10-Q at 12; 3Q14 Form 10-Q; 2014 Form 10-K at 75. It was not until October 28, 2014, after the iPhone 6 and 6 Plus launch, that Defendants wrote down $7.4 million in "earlier generation inventory," an amount roughly in line with the reported value of 20 million 3-axis MEMs chips. *See, e.g.*, 2Q15 InvenSense, Inc. Earnings Call, Oct. 28, 2014 at 3. As a result of the write down, InvenSense's reported inventory shrank for the first time since the inventory build-up prior to the launch of the iPhone 5S and 5C. *See, e.g.*, InvenSense, Inc. Quarterly Report (Form 10-Q) (Oct. 31, 2014).

50. In addition to the above sources, Lead Plaintiff's allegations regarding InvenSense's inventory of and inability to sell the 20 million 3-axis MEMS chips that had been manufactured for use in the iPhone 5S and 5C are based on and corroborated by investigative interviews with a former InvenSense officer who has requested to remain anonymous.

### D. Defendants' Class Period Statements Regarding Pricing Terms with Apple

51. Defendants' statements on July 29, 2014 and August 7, 2014 regarding InvenSense's new customer (Apple) and pricing on its 6-axis MEMS chips for Apple, identified in ¶¶44, 46, were materially false and misleading when made. Defendants failed to disclose that they had agreed to commit the majority of InvenSense's manufacturing capacity of new, 6-axis MEMS chips to Apple in 2Q15 for use in the iPhone 6 and 6 Plus at a price significantly below what InvenSense had negotiated, on average, with other major customers. Given the terms of the Apple purchase order, under which InvenSense was committed to delivering at least 35 million 6-axis MEMS chips during 2Q15 for approximately 40% margin, there was no basis for Defendants' claim that the pricing of InvenSense's 6-axis MEMS chips from Apple were "generally very consistent" with "recent past," *i.e.*, as compared to InvenSense's only other high volume customer, Samsung, and that "there's no one customer with any particular window of pricing that's relevant."

52. When defendants Abdi and Krock spoke on July 29, 2014, they knew or were reckless in not knowing their statements regarding pricing were false based on the contractual terms

of Apple's purchase order for 6-axis MEMS chips for its iPhone 6 and 6S. Defendants' own statements confirm that the Apple contract for the iPhone 6 and 6S was in place as of July 29, 2014. *See* ¶¶41-42, 44. Following Defendants' October 28, 2014 disclosures, industry observers were able to calculate that InvenSense's pricing on the 6-axis MEMS chips sold to Apple under the iPhone 6 and 6S yielded a gross margin of only 40% as compared to pricing obtained from other customers which yielded gross margins of 51% in FY14, 53% in FY13 and 56% in FY12. 6-axis Cost Analysis at 106-108. In contrast to Defendants' prior statements, the gross margins under the Apple contract pricing terms resulted in margins approximately 20% lower than the margins received on InvenSense's chip sales to its other major customer, Samsung. *Id.* at 107-108.

53. As a result of Defendants' failure to disclose the true, material facts regarding InvenSense's inventory and the pricing terms of 6-axis MEMS chips for Apple, the Company's stock price traded at artificially inflated prices above $20 per share during the Class Period.

## VI. THE TRUTH ABOUT INVENSENSE'S INVENTORY AND PRICING OF 6-AXIS MEMS CHIPS FOR APPLE IS DISCLOSED

54. Following the close of the market on October 28, 2014, InvenSense issued a press release announcing 2Q15 financial results. While the press release reported revenues in line with guidance for InvenSense, investors were stunned to learn of a "sequential decrease in gross margin []as primarily attributable to two factors: a non-recurring inventory charge largely related to earlier generations of the company's products that reduced the gross margin by approximately eight percentage points, and a shift in revenue mix towards lower margin, high volume customers that reduced the gross margin by approximately five percentage points."

55. Later that evening, the Company held a conference call for analysts and provided additional information about the Company's poor performance. During his opening remarks on the call, defendant Krock's replacement as CFO, Mark Dentinger ("Dentinger"), again identified the two primary drivers of the gross margin drop as (1) a $7.4 million write down of excess or obsolete "earlier generation inventory" and (2) a change in customer mix to more of the Company's "largest

customers" – namely Apple – who had "lower average selling prices."[4] With regard to the second driver, Dentinger admitted that the change in customer mix was not related to an unexpected increase in the volume of chips sold to large customers as "[r]evenue from customers who individually made up more than 10% of total revenue in Q2 was 55% [and] 10%-plus customers in Q1 made up 52% of our total revenue."

56. During the conference call, analysts focused on the drivers of the substantial gross margin drop. Contrary to Defendants' July 29, 2014 statement that "there's no one customer with any particular window of pricing that's relevant" to margins, defendant Abdi now admitted that reduced pricing had been "given to some of the customers [Apple] to get the revenue and the market [share] and to really get that going." Then, Abdi claimed that "if you look at our business mix, the top two customers [*i.e.*, Apple and Samsung] are more dominant this past quarter and the current quarter than we anticipated when we started. . . . So it is really the mix, as Mark mentioned, is more than anticipated towards the tier ones." As a result, conference call analysts questioned how that "mix" could have had such a negative impact on margins when the revenue contribution from the Company's 10% customers only moved from 52% in 1Q15 to 55% in 2Q15. In response, Dentinger conceded that "[i]t is true that our contribution from 10% customers moved from 52% to 55% during the quarter," and acknowledged that it was the ***prices*** paid by those customers that drove the margin down: "So we only had two [10%] customers contributing in Q2 [Apple and Samsung], so there was a pretty substantial move inside the 10% customers upstream to the lower margin arena."

57. Investors were stunned by the disclosure of the truth about InvenSense's inventory and pricing of 6-axis MEMS chips for Apple. In response to the October 28, 2014 disclosures, the price of InvenSense common stock plummeted over 25% from $21.48 per share prior to the disclosures to a closing price on the next day, October 29, 2014, of $16.08 per share. InvenSense's trading volume on October 29, 2014 alone exceeded 16 million shares, more than five times the Company's average daily trading volume.

---

[4] A third factor, InvenSense's "yielded manufacturing costs, especially for . . . newer products, [was] higher than . . . expected" and was reported to have lowered the 2Q15 gross margin by 2%.

58. In the seven months since the October 28, 2014 disclosures, InvenSense's stock price has never even approached its Class Period levels and currently trades for under $15.00 per share.

## VII. INVENSENSE'S FALSE FINANCIAL STATEMENTS VIOLATED GAAP

59. In order to artificially meet Wall Street analysts' financial targets and convince Apple and the market that InvenSense had the capacity to meet its MEMS chip demands for the iPhone 6 and 6 Plus while still meeting its other customers' demands, Defendants improperly accounted for inventory, materially and falsely reported inflated gross profit and inventory and understated cost of revenue, net losses and losses per share for 1Q15 in violation of GAAP.

60. InvenSense's 1Q15 financial statements were false and misleading because the Company had improperly failed to write-off at least $6.90 million of product inventory that Defendants knew or were reckless in not knowing was excess, obsolete or unsalable by no later than June 29, 2014.

61. As alleged in ¶¶8-9, 47-48, by the end of the fiscal quarter ended September 29, 2013 (3Q14), InvenSense had fabricated and stockpiled approximately 20 million 3-axis MEMS chips at an approximate cost of $0.44 per chip in a failed attempt to obtain a design win with Apple for the iPhone 5S and 5C. However, Apple was not obligated to, and ultimately did not, buy or pay for the 3-axis MEMS chips InvenSense had designed and ramped up in support of Apple's September 20, 2013 launch of the iPhone 5S and 5C.

62. Accordingly, by no later than the end of 3Q14, InvenSense was stuck with approximately $8.8 million of inventory (20 million chips x $0.44 approximate cost) that had been designed and built for Apple and would quickly become obsolete or unsalable in the wake of the Company's iPhone 5S and 5C design loss. Defendants Abdi and Krock knew this to be true because in their positions as CEO and CFO of InvenSense, they knew that the Company's high-volume customers for these types of MEMS chips were continually demanding enhanced, newly designed and/or increasingly higher-performing versions of the chips with nearly every new or refreshed smartphone or tablet model. Indeed, the Company itself remarked in its Form 10-K for the period ending March 30, 2014 that the environment in which it operated was characterized by rapidly changing technologies, technological obsolescence, price erosion, rapid shifts in customer's product

architecture and short product life. Compounding matters were those 3-axis MEMS chips in the Company's inventory which suffered from manufacturing yield problems and did not meet any high-volume customer's specifications, much less Apple's.

63. As alleged in ¶¶9, 47-48, the only real potential sales outlet for the leftover Apple 3-axis MEMS chip inventory was a secondary market consisting mainly of a few Chinese-based white box handset or toy manufacturers. Those potential customers, however, only ordered chips in quantities a fraction of the size of InvenSense's inventory of approximately 20 million units. For example, in 3Q14, the Company was projected to only sell 4.4 million units across its entire product line to white box vendors. Moreover, the Chinese handset and toy manufacturers did not need the full capabilities offered by InvenSense's 3-axis chips and, accordingly, were not willing to pay as much as Apple or other large manufacturers for the products. Further, in the case of defective 3-axis MEMS chips, the Company would have had to focus engineering resources on making after-the-fact modifications to the chips before they could be sold to the Chinese manufacturers, and, as of mid-2013, it was not doing so in order to focus on its high-volume customers. Despite these facts, prior to the Class Period, InvenSense failed to write off any of the leftover 3-axis MEMS chip inventory that had been designed and ramped up for the iPhone 5S and 5C in 2013.

64. Pursuant to GAAP, inventory must be valued at the lower of the cost to acquire or build the inventory, or its market value. This is a fundamental accounting rule known more simply as the "lower of cost or market" rule. If the value of inventory carried at cost is diminished by obsolescence, lower price levels, excess quantities or other circumstances, a loss must be recognized by a charge against income in the accounting period in which the loss occurs, to write-down the inventory to its lower market value. Specifically, FASB Accounting Standards Codification ("ASC") 330-10-35-1, Inventory, states:

> **Adjustments to Lower of Cost or Market**
>
> 35-1 A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as their cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

65. Therefore, according to GAAP, InvenSense was required to write down the excess and obsolete 3-axis MEMS chip inventory it had ramped up to support Apple in 2013. But the Company failed to do so, despite telling investors that it regularly reviewed inventory valuations. In its "Summary of Significant Accounting Polices" note to its year end March 30, 2014 consolidated financial statements, InvenSense claimed that it had reviewed its inventory values and quantities for obsolescence, and taken charges for excess or obsolete inventory as necessary in order to state inventories at the lower of cost or market value as required by GAAP:

> **Inventories**
>
> Inventories are stated at the lower of cost or market on a first-in, first-out basis. Inventories include finished good parts that may be specialized in nature and subject to obsolescence. The Company periodically reviews the quantities and carrying values of inventories to assess whether the inventories are recoverable. The costs associated with write-downs of inventory for excess quantity and technological obsolescence are charged to cost of revenue as incurred.

66. In its 1Q15 Form 10-Q filed on August 7, 2014, InvenSense falsely represented that its statement in its year-end public financial statements – that it had reviewed its inventory for obsolescence and accounted for it accordingly – was still true, and confirmed that no material changes had been made to these accounting policies since that date. The Company stated, in pertinent part, as follows:

> These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and the notes thereto for the fiscal year ended March 30, 2014 included in the Company's Annual Report on Form 10-K filed on May 29, 2014 with the Securities and Exchange Commission ("SEC"). No material changes have been made to the Company's significant accounting policies since the Company's Annual Report on Form 10-K for the fiscal year ended March 30, 2014.
>
> * * *
>
> ***The consolidated financial statements have been prepared in conformity with U.S. generally accepted accounting principles, or GAAP*** . . . .

67. These statements were false when made. Contrary to the inventory accounting policy statements made in the footnotes to its public financial statements, Defendants knew or were reckless in not knowing that at least $6.90 million of its leftover Apple iPhone 5S/5C 3-axis MEMS chip inventory ((approximately 20 million units built minus maximum of 4.4 million units sold) x $0.44 per chip) was excess, obsolete or unsalable as of June 29, 2014. Despite this knowledge, Defendants

failed to take the necessary $6.90 million charge against cost of revenues to write down inventory balances to reflect the diminished value of its obsolete and excess inventory as required by GAAP. Accordingly, the Company's gross profit margin was also overstated. The impact of this misstatement on the Company's publicly disseminated financial statements was material, and is summarized as follows:

**Summary of InvenSense Key Public Financial Statement Misstatements (In millions, except earnings (loss) per share)**

| | Three Months Ended 6/29/2014 | | | |
|---|---|---|---|---|
| | **Cost of Revenue** | **Gross Profit** | **Net Income (Loss)** | **Earnings (Loss) Per Share** |
| As reported in 6/29/14 10-Q | $35.50 | $31.20 | ($4.80) | ($0.05) |
| Actual (after inventory correction) | $42.40 | $24.30 | ($11.70) | ($0.13) |
| **Amount under/overstated** | **$6.90** | **$6.90** | **$6.90** | **$0.08** |
| **Percentage under/overstated** | **16%** | **28%** | **59%** | **62%** |

68. As a result of Defendants' failure to timely write off excess, obsolete and unsalable inventory, InvenSense's financial statements filed on its 1Q15 Form 10-Q were materially false and misleading and violated GAAP, as the Company's reported gross profit was inflated by at least $6.90 million and EPS was overstated by at least $0.08. On a percentage basis, these misstatements were also material, inflating the Company's reported gross profit by 28% and overstating its net income and EPS by 59% and 62%, respectively.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

69. Defendants acted with scienter in that Abdi and Krock both made specific statements regarding InvenSense's inventory and pricing of 6-axis MEMS chips, as set forth in ¶¶40-44 and 46, and thus knew, or were reckless in not knowing, the true facts regarding the Company's inventory and pricing terms with Apple for 6-axis MEMS chips, particularly because they related to Apple – one of only two 10% customers who contributed to InvenSense's revenue in 2Q15. The Company had been trying to obtain a design win with Apple since at least 2010, and, under Abdi, had even started volume production of 3-axis MEMS chips for Apple's iPhone 5S and 5C in 2013. Given the importance of obtaining Apple as a customer and Defendants' constant discussion of the Company's

design wins with customers, Abdi and Krock knew or were reckless in not knowing about the approximately 20 million 3-axis MEMS chips leftover from the design loss for the iPhone 5S and 5C in 2013, and that the June 2014 purchase order with Apple required the delivery of at least 35 million 6-axis MEMS chips for the iPhone 6 and 6 Plus in 2Q15 and included pricing terms that only yielded margins of approximately 40%. Abdi and Krock further knew, or were reckless in not knowing, that the pricing and volume terms for the design win with Apple, given the volume of chips Apple required, would materially affect the Company's margins and profits. The market certainly knew, and closely followed the Company's disclosures regarding design wins. As Krock recognized during the July 29, 2014 call, design win details, such as "units and ASP as a whole," were included in SEC filings which investors "do look at." And regarding inventory, Abdi declared during the October 28, 2014 call that they watch inventory issues "very carefully" and "pretty closely."

70. Accordingly, Abdi and Krock knew that their statements in the July 29, 2014 press release and conference call and August 7, 2014 Form 10-Q relating to the Company's inventory and pricing of 6-axis MEMS chips for Apple were materially false and misleading; knew that such statements and documents would be disseminated to the investing public; and knowingly and substantially participated in the issuance and dissemination of such statements and documents as primary violations of the federal securities laws. Abdi and Krock participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts regarding InvenSense's excess and obsolete 3-axis inventory from the 2013 Apple design loss and purchase order with Apple for 6-axis MEMS chips at prices substantially lower than those for its other customers, their control over, receipt and/or review of the 2Q15 press release and Form 10-Q before and after they were issued, and their associations with the Company which made them privy to confidential information concerning InvenSense's inventory and pricing terms with Apple, as set forth in ¶¶28-39.

71. Krock was further motivated to engage in this fraudulent course of conduct in order to dump over 96% of his personally-held InvenSense common stock at inflated prices. As set forth below, Krock sold over 126,000 shares during the three month Class Period for insider trading proceeds of over $3 million:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 18-Aug-2014 | 1,666 | $24.70 | $41,150 |
| 27-Aug-2014 | 69,650 | $25.03 | $1,743,340 |
| 27-Aug-2014 | 25,000 | $24.88 | $622,000 |
| 27-Aug-2014 | 5,350 | $25.03 | $133,911 |
| 28-Aug-2014 | 25,000 | $25.33 | $633,250 |
| | **126,666** | | **$3,173,650** |

72. Krock's sales during the Class Period were at unusual times and amounts. Krock sold only 25,000 of his InvenSense shares during the same quarter the prior year (2Q13) and only 25,000 shares in the quarter proceeding to the Class Period (1Q15). Based on his SEC Form 4 filings, as of August 28, 2014, when InvenSense's stock was trading at over $25 per share, Krock had sold 96% of the shares he held at the beginning of the Class Period. Defendants' scheme enabled Krock to sell more than 96% of his InvenSense stock for proceeds of $3,173,650 less than a month after making false and misleading statements on July 29, 2014, and then to quickly resign from his position as CFO before the market learned the truth.

## IX. LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS

73. During the Class Period, as detailed herein, Defendants engaged in a scheme and wrongful course of business that was designed to and did artificially inflate InvenSense's stock price, whose misconduct operated as a fraud and deceit on Class Period purchasers of the Company's common stock. Defendants did this by making materially false and misleading statements and omissions regarding InvenSense's inventory and pricing of 6-axis MEMS chips as set forth in ¶¶40-44, 46. When the false and misleading nature of Defendants' statements was revealed after the market closed on October 28, 2014, InvenSense's stock price dropped precipitously from $21.48 per share to $16.08 per share by the close of trading on October 29, 2014 as the artificial inflation dissipated. As a result of their purchases of InvenSense common stock during the Class Period at artificially inflated prices, Lead Plaintiff and other Class members suffered significant damages.

74. The market for InvenSense common stock was open, well-developed and efficient at all relevant times, with average daily trading volume of more than 3,148,553 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein,

InvenSense's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased or otherwise acquired InvenSense common stock relying upon the integrity of the market relating to InvenSense common stock and suffered economic losses as a result thereof.

75. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' misrepresentations artificially inflating InvenSense's stock price and the subsequent significant decline in the value of InvenSense common stock when the truth was revealed after the market closed on October 28, 2014.

76. On that day, it was disclosed that InvenSense had to take a $7.4 million charge for excess and obsolete 3-axis inventory and that the ASPs on the Company's products had dropped considerably as a result of the steep pricing discounts the Company had to give to Apple. As a direct result of the October 28, 2014 disclosure of the truth about InvenSense's inventory and pricing of its 6-axis MEMS chips sold to Apple, and as illustrated in the chart below, the price of the Company's common stock suffered a significant decline. By the close of the market on the next day, October 29, 2014, InvenSense's common stock price had dropped more than 25%, a loss of $5.40 per share.




77. The decline in InvenSense's common stock price on October 29, 2014 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the market closed on October 28, 2014. The timing and magnitude of InvenSense's stock price decline evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct. Indeed, as illustrated in the chart above, on the same day that InvenSense's common stock share price closed down over 25%, the Standard & Poor's 500 Index and Dow Jones Industrial Index each decreased less than a percentage point. Moreover, there was no news about InvenSense, other than the disclosures in the October 28, 2014 press release or conference call, that could fully explain the Company's stock price decline.

78. The economic loss Lead Plaintiff and other Class members suffered was a direct result of Defendants' fraudulent scheme to artificially inflate InvenSense's stock price and maintain that price at artificially inflated levels, as was revealed by the subsequent and significant decline in the value of InvenSense's stock when the truth about Defendants' earlier misrepresentations and omissions became publicly available.

## X. CLASS ACTION ALLEGATIONS

79. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased InvenSense common stock during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

80. The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. At all relevant times, InvenSense's common stock was actively traded on the NYSE. Record owners and other Class members may be identified from records maintained by InvenSense or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to Lead Plaintiff, InvenSense reported that more than 88 million shares of its common stock were outstanding as of May 7, 2014. Accordingly, Lead Plaintiff reasonably believes there are hundreds, if not thousands, of members in the proposed Class.

81. Lead Plaintiff's claims are typical of the claims of the members of the Class as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

82. Lead Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

83. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public misrepresented or omitted material facts about the business, operations and financial conditions of InvenSense;

(c) Whether the price of InvenSense common stock was artificially inflated during the Class Period; and

(d) To what extent the Class members have sustained damages and the proper measure of damages.

84. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

85. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

86. Defendants are liable for making false statements and failing to disclose adverse facts known to them about InvenSense. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of InvenSense common stock was a success, as it: (i) deceived the investing public regarding InvenSense's business and financial condition; (ii) artificially inflated the price of InvenSense common stock; and (iii) caused Lead Plaintiff and other Class members to purchase InvenSense common stock at inflated prices.

87. During the Class Period, Defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations

and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

88. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of InvenSense common stock during the Class Period.

89. Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about InvenSense's business, operations and financial condition as specified herein.

90. Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary to make the statements made about the Company and its business operations and financial status, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Defendants further engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of InvenSense common stock during the Class Period.

91. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowing, or with reckless disregard for, the truth, and for the purpose and effect of concealing InvenSense's operating condition and financial status from the investing public and supporting the artificially inflated price of its common stock.

92. As a result of the dissemination of materially false or misleading information and failure to disclose material facts, as set forth in ¶¶40-44, 46, the market price of InvenSense common stock was artificially inflated during the Class Period. In ignorance of the fact that the market prices of the Company's stock were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in Defendants' public statements during the Class Period, Lead Plaintiff and the other Class members acquired InvenSense's common stock during the Class Period at artificially inflated prices and were ultimately damaged thereby.

93. At the time of said misrepresentations and omissions, Lead Plaintiff and the other Class members were ignorant of their falsity, and believed them to be true and complete. Had Lead Plaintiff, the other Class members and the marketplace known the truth regarding InvenSense's inventory and pricing terms for 6-axis chips sold to Apple, which Defendants did not disclose, Lead Plaintiff and the other Class members would not have purchased or otherwise acquired InvenSense's stock at the artificially inflated prices which they paid.

94. By reason of the foregoing, Defendants have violated §10(b) of the 1934 Act and Rule 10b-5.

95. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period purchases of InvenSense common stock.

**COUNT II**
**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

96. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

97. Defendants Abdi and Krock acted as controlling persons of InvenSense within the meaning of §20 of the 1934 Act. InvenSense controlled all of its employees and each of the Individual Defendants. By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of InvenSense's finances and operations, including the

Company's inventory of MEMS chips and business relationship with Apple, as well as their intimate knowledge of the statements made to the investing public on July 29, 2014 and August 7, 2014, Abdi and Krock had the power to influence and control, and did influence and control, directly or indirectly, the Company's decision making, including the content and dissemination of the statements Lead Plaintiff contends are false and misleading. Abdi and Krock participated in the July 29, 2014 conference call with investors and analysts and were provided with, or had unlimited access to, copies of the Company's July 29, 2014 press release and August 7, 2014 Form 10-Q, alleged by Lead Plaintiff to be false and misleading, prior to and/or shortly after they were issued, and had the ability to prevent their issuance or cause them to be corrected.

98. In particular, each of these Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, in particular, the design, manufacturing and sale (or lack thereof) of MEMS chips to Apple, and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

99. As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases of InvenSense's publicly traded common stock during the Class Period.

## XI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Declaring that Defendants are liable pursuant to the 1934 Act;

B. Determining and certifying that this action is a proper class action and certifying Lead Plaintiff as a class representative and its counsel as Lead Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

C. Awarding compensatory damages in favor of Lead Plaintiff and the Class against Defendants, jointly and severally, for damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

D. Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E. Awarding such other relief as the Court may deem just and proper.

## XII. JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: April 18, 2016

ROBBINS GELLER RUDMAN
& DOWD LLP
TOR GRONBORG
IVY T. NGO

s/ TOR GRONBORG
TOR GRONBORG

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 18, 2016.

s/ TOR GRONBORG
TOR GRONBORG

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: TorG@rgrdlaw.com

# Mailing Information for a Case 3:15-cv-00084-JD In re InvenSense, Inc. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **David E. Azar**
  dazar@milberg.com,pwedgworth@milberg.com,maoffice@milberg.com,cchaffins@milberg.com,jconte@milberg.com,dgjonaj@milberg.com
- **Peter E. Borkon**
  peterb@hbsslaw.com
- **David Malcolm Furbush**
  david.furbush@pillsburylaw.com,james.lindfelt@pillsburylaw.com,cate@pillsburylaw.com
- **Francis M. Gregorek**
  gregorek@whafh.com
- **Tor Gronborg**
  torg@rgrdlaw.com
- **Nathan R. Hamler**
  nathanh@johnsonandweaver.com,paralegal@johnsonandweaver.com,shawnf@johnsonandweaver.com,michaelf@johnsonandweaver.com
- **Marisa C. Livesay**
  livesay@whafh.com,boyles@whafh.com
- **Betsy Carol Manifold**
  manifold@whafh.com,boyles@whafh.com,loritsch@whafh.com
- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Ivy T Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Mark Punzalan**
  markp@punzalanlaw.com,office@punzalanlaw.com
- **Rachele R. Rickert**
  rickert@whafh.com,cabrera@whafh.com,boyles@whafh.com,loritsch@whafh.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net
- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)